STATE, Respondent, v. DOMBROWSKI, Appellant.*

*No. State 26.   Argued October 1, 1969.—Decided October 31, 1969.*
(Also reported in 171 N. W. 2d 349.)

* Motion for rehearing denied, without costs, on December 19, 1969.

488

490

For the appellant there were briefs and oral argument by *David Leichtfuss* of Milwaukee.

For the respondent the cause was argued by *Betty R. Brown,* assistant attorney general, with whom on the brief were *Robert W. Warren,* attorney general, *William A. Platz,* assistant attorney general, and *Alexander P. Semenas,* district attorney of Fond du Lac county.

WILKIE, J. Appellant's principal attack on his conviction is that the evidence is insufficient to support a finding of guilt. But before we analyze that contention we first must consider appellant's assertion that much of the state's important evidence was produced by searches which were violative of his constitutional rights.

## I. SEIZURE OF EVIDENCE.

### A. *1967 Thunderbird*

At this point, a brief reiteration of the facts surrounding the seizure of state's Exhibits Nos. 1 through 13 is helpful.

Late in the evening of September 11th, appellant was driving the rented 1967 Thunderbird in Washington county when he ran off the road and hit a bridge abutment. Shortly thereafter a passerby picked up the appellant on the highway and took him back to Kewaskum where appellant then notified the Washington county sheriff's department of the accident. Appellant met Officers Weiss and Boudry at a tavern in Kewaskum and accompanied them back out to the accident scene. During this time he repeatedly informed the officers that he himself was a Chicago police officer. When they reached the accident scene, Officer Boudry made a cursory examination of the inside of the Thunderbird, including the glove compartment and under the seat, looking for

appellant's service revolver, which he assumed metropolitan police officers always carried with them. The record does not reveal whether a search of appellant's person was made at this time or, for that matter, at any time. This examination revealed nothing. In any event, a wrecker was called to remove the Thunderbird to a garage in Kewaskum.

In the meantime, appellant was taken to the sheriff's office in West Bend where, at 11:58 p. m., he was placed under arrest for drunken driving. Then appellant was removed to a hospital for treatment for minor injuries where he remained for the night in a guarded room.

Approximately two and one-quarter hours after appellant was arrested, Officer Weiss went to the garage in Kewaskum to again look for the appellant's service revolver in the car. It is established that Officer Weiss did not have a search warrant, did not have defendant's consent to search the car, and did not know of the murder of McKinney at this time.

During this examination of the car, Officer Weiss again checked through the inside of the Thunderbird for the gun. Finding nothing, he opened the trunk of the vehicle wherein he found and seized the blood-soaked items previously described. These items were ultimately admitted into evidence at appellant's trial as state Exhibits Nos. 1 through 13, the most important of which was Exhibit No. 13, part of the floor mat (bloodstained) of the 1960 Dodge.

Whether searches and seizures are valid is a question of federal constitutional law.[1]

Although this court is divided on the question, the majority concludes that in the instant case there was no search at the time Officer Weiss made his inspection of the Thunderbird at the Kewaskum garage.

---

[1] *Kluck v. State* (1967), 37 Wis. 2d 378, 385, 155 N. W. 2d 26; *Browne v. State* (1964), 24 Wis. 2d 491, 502, 129 N. W. 2d 175, 131 N. W. 2d 169.

This court, in *Edwards v. State*,[2] said: " 'A search implies a prying into hidden places for that which is concealed.' " [3] And, according to *Haerr v. United States*,[4]

"A search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action. The term [search] implies exploratory investigation or quest." [5]

The leading United States Supreme Court case of *Harris v. United States*,[6] is especially in point. In that case petitioner's car was seen leaving the scene of a robbery. The car was traced and petitioner was arrested as he entered it. After cursory inspection of the car, the arresting officer took the petitioner to the police station. There the police decided to impound the car as evidence. A crane was called to tow the car to the precinct. It reached the precinct about an hour and a quarter after petitioner arrived.

A regulation of the Metropolitan Police Department required the officer who took an impounded vehicle in charge to "search" the vehicle thoroughly, to remove all valuables from it, and to attach to the vehicle a property tag listing certain information about the circumstances of the impounding. Pursuant to this regulation and without a warrant, the arresting officer proceeded to the lot to which petitioner's car had been towed in order to search the vehicle. The officer entered on the driver's side, searched the car, and tied a property tag on the steering wheel. Stepping out of the car, he rolled up an open window on one of the back doors. Proceeding to the front door on the passenger side, the officer opened the door in order to secure the window and the door. He

---

[2] (1968), 38 Wis. 2d 332, 156 N. W. 2d 397.

[3] *Id.* at page 338, quoting from *People v. Marvin* (1934), 358 Ill. 426, 428, 193 N. E. 202.

[4] (5th Cir. 1957), 240 Fed. 2d 533.

[5] *Id.* at page 535.

[6] (1968), 390 U. S. 234, 88 Sup. Ct. 992, 19 L. Ed. 2d 1067.

then saw the registration card belonging to the robbery victim, which lay face up on the metal stripping over which the door closed.

The United States Supreme Court posed: "The sole question for our consideration is whether the officer discovered the registration card by means of an illegal search." [7]

Answering, it concluded:

". . . [T]he discovery of the card was not the result of a search of the car, but of a measure taken to protect the car while it was in police custody. Nothing in the Fourth Amendment requires the police to obtain a warrant in these narrow circumstances.

"Once the door had lawfully been opened, the registration card, with the name of the robbery victim on it, was plainly visible. It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." [8]

Although here there was no police regulation similar to the one in *Harris,* Officer Weiss did testify that it was "standard procedure" in his department to look in a car, being held like the appellant's, for the service revolver. This would be a reasonable precaution taken to protect the suspect's property which might be in the car.

The majority of the court is convinced that this inspection was done within a reasonable time of the car's transfer to the Kewaskum garage, and was accomplished while the police were responsible for its protection and were in the process of protecting Dombrowski's property and were not, at that time, engaged in a search of the car looking for incriminating evidence.

Another case, *United States v. Blackburn,*[9] also is authority for the legality of what was done here. In that

---

[7] *Id.* at page 236.

[8] *Id.*

[9] (6th Cir. 1968), 389 Fed. 2d 93.

case, a pistol and a notebook, found in a motel room after the defendants had been arrested elsewhere, were received in evidence. These items were discovered when the police, with no intention of making a search for evidence or instruments of the crime and in accordance with their standard procedure, went to the motel room for the purpose of gathering up the effects of the arrested persons, itemizing them, and storing them for safekeeping. The court held, in accordance with *Haerr*,[10] that this was not a search.

The court said:

". . . The conduct of the police department in sending for the personal effects of the parties, itemizing them and storing them for safekeeping was entirely reasonable and logical. We find that the action of the police officers does not constitute a search."[11]

A minority of this court, including the writer of this opinion, concludes that the seizure here was a search primarily on the ground that there was over a two-hour time lapse from when Dombrowski was arrested for drunk driving. The minority would conclude that the search was unreasonable for the same reason that the search was declared illegal in *Preston v. United States*.[12] There, petitioner and others were arrested for vagrancy after they failed to give an acceptable explanation of their presence in a parked car late at night. They were taken to the police station, and the car was taken first to the station and then to the garage. After the men were booked, police officers went to the garage, searched the car without a warrant, and found evidence, in the trunk, incriminating petitioner and others of conspiracy to rob a federally insured bank. The United States

[10] *Supra*, footnote 4.

[11] *United States v. Blackburn, supra*, footnote 9, at page 95.

[12] (1964), 376 U. S. 364, 84 Sup. Ct. 881, 11 L. Ed. 2d 777.

Supreme Court reversed the conviction finding that the search was not incident to the arrest.[13]

B. *1960 Dodge*

The victim's body was found on the farm sometime between 3 and 4 p. m. on September 12, 1967. In the evening of that day, Undersheriff Raymond Howard made application for a search warrant to Hon. HAZEN W. MCESSY, Fond du Lac county judge. After taking testimony from Howard, Judge MCESSY issued a search warrant.

Thereafter, Howard searched the 1960 Dodge and made a return listing some, but not all, of the items recovered. The appellant attacks this warrant; but the state contends that none of the items recovered were received in evidence and that accordingly there is no reason to reach appellant's arguments.

The appellant points out, however, that Exhibit No. 32, part of the floor mat of the Dodge, and Exhibit No. 37, the white sock which matched the one found near McKinney's body, were received in evidence. The part of the floor mat found in the Dodge, Exhibit No. 32, fit together exactly with Exhibit No. 13, the part of the floor mat found in the Thunderbird. The sock from the Dodge was identical to the one found near the body of McKinney.

It is necessary to recite some additional facts surrounding the discovery and introduction into evidence of these items. These items were not listed on the sheriff's return to the warrant. As previously indicated, although they were taken up and labeled by Cleon Mauer of the crime lab on September 13, 1967, they were items in plain view when Undersheriff Howard was by the Dodge on the day before, September 12th, and before the search

---

[13] *Id.* at page 368.

warrant proceedings. Thus, these items were in plain view and subject to seizure without a warrant.[14]

C. *Open fields of Dombrowski farm*

After the appellant, through his attorney, informed the Washington county authorities that he believed there was a body in the picnic area of the north end of his brother's farm, the authorities went to this location where they found McKinney's dead body. Thereafter, the bloody 1960 Dodge was discovered on the farm, located about half a block from the farmhouse.

We do not reach the question of whether the appellant had proper standing to move to suppress the evidence because no search warrant was required to search the open fields on the Dombrowski farm.[15]

We need not consider the validity of any search of the Dombrowski farm buildings since no evidence seized there pursuant to the search warrant issued on September 13th by Hon. HAZEN W. MCESSY was offered or admitted at the trial.

In summary, this court concludes that the disputed items, introduced as evidence after the seizures of the items in the check of the trunk of the 1967 Thunderbird made by Officer Weiss, the inspection of the 1960 Dodge by crime lab officer Cleon Mauer, and the inspection of the fields of the Dombrowski farm, were all produced without resort to any search in the constitutional sense.

II. SUFFICIENCY OF THE EVIDENCE.

Even considering this evidence obtained during the several questioned seizures which we have concluded

[14] *See Harris v. United States, supra,* footnote 6; *Edwards v. State, supra,* footnote 2.

[15] *Katz v. United States* (1967), 389 U. S. 347, 88 Sup. Ct. 507, 19 L. Ed. 2d 576; *Hester v. United States* (1924), 265 U. S. 57, 44 Sup. Ct. 445, 68 L. Ed. 898; *Weeks v. United States* (1914), 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652.

were legal, the appellant strenuously contends that there is insufficient evidence to sustain the conviction.

It is conceded that the state's entire case is circumstantial. Even so, we conclude that the circumstantial evidence is most convincing.

In *State v. Johnson*,[16] we said:

". . . A notion exists that all circumstantial evidence should be viewed with distrust because it can establish, at most, only a possibility of guilt. Such an opinion, based on the theory that circumstantial evidence can only be the basis for conjecture and is impotent to correctly indicate or to satisfactorily establish the facts upon which guilt must rest to the required degree of certainty, is unwarranted. It is true that circumstantial evidence in many cases may be so weak as not to meet the standard of proof. But circumstantial evidence may be and often is stronger and more satisfactory than direct evidence; *Schwantes v. State* (1906), 127 Wis. 160, 106 N. W. 237, and *Spick v. State* (1909), 140 Wis. 104, 121 N. W. 664, . . . ." [17]

In *Johnson* we also said, citing *Kollock v. State*,[18] that the principles applicable to circumstantial evidence are:

". . . 1. That each of the several circumstances upon which the conclusion of guilt necessarily depends must be proved beyond a reasonable doubt; and 2. they must not only point with moral certainty to the guilt of the defendant, but must exclude to a moral certainty every other reasonable hypothesis. *The rule does not require the exclusion of all other possible hypothesis or even probabilities, but only reasonable hypotheses of innocence.*" (Emphasis added.) [19]

On this issue in this appeal it is this court's duty to determine whether the circumstantial evidence is suffi-

[16] (1960), 11 Wis. 2d 130, 104 N. W. 2d 379.
[17] *Id.* at page 135.
[18] (1894), 88 Wis. 663, 60 N. W. 817.
[19] *State v. Johnson, supra,* footnote 16, at page 135.

cient to sustain the finding of guilt.[20] This court as an appellate court does not and cannot retry the case on the facts in the record to determine if it is convinced of defendant's guilt beyond a reasonable doubt.

The question before this court is " 'whether the evidence adduced, believed and rationally considered by the jury, was sufficient to prove the defendant's guilt beyond a reasonable doubt.' " [21]

In other words, as we have often stated, before this court will reverse a conviction because of insufficiency of the evidence,

". . . the evidence when considered most favorably to the state and the conviction must be so insufficient in probative value and force that it can be said as a matter of law that no trier of the facts acting reasonably could be convinced to that degree of certitude which the law defines as 'beyond a reasonable doubt.' " [22]

This was a ten-day trial. We have examined the record in detail, have considered the arguments of both counsel and their exhaustive analysis of the maze of details in this circumstantial case. We are satisfied that the evidence is sufficient to sustain the conviction.

There are only two phases of the proof which we choose to comment on further. They are the questions of venue and the relationship of the victim and appellant.

A. *Venue*

Appellant contends that there was insufficient evidence to prove that the venue of the trial was properly in Fond du Lac county. Venue is not an element of the crime of murder but merely refers to the place of trial.

[20] *See State v. Schweider* (1959), 5 Wis. 2d 627, 94 N. W. 2d 154.

[21] *State v. Stevens* (1965), 26 Wis. 2d 451, 463, 132 N. W. 2d 502 (and cases cited therein) ; *see also State v. Nutley* (1964), 24 Wis. 2d 527, 547, 129 N. W. 2d 155.

[22] *Lock v. State* (1966), 31 Wis. 2d 110, 115, 142 N. W. 2d 183.

It is a matter of procedure and designates the geographic division of the state in which the action is to be tried.[23] Nevertheless, venue, in Wisconsin, must be proved beyond a reasonable doubt.[24] By sec. 956.01 (1), Stats., criminal actions are to be tried in the county where the crime was committed except as otherwise provided in that section.

Sub. (3) of sec. 956.01, Stats., provides:

". . . If a wound or other violence is inflicted . . . in one county and causes death which ensues in another county, the crime may be prosecuted in either county."

Sub. (4) of sec. 956.01, Stats., provides:

". . . If such wound or other violence is inflicted . . . without this state and death ensues therefrom in this state, the crime may be prosecuted and sentence be imposed in the county where the death occurs."

Thus in order to establish venue in Fond du Lac county, it must be proved beyond a reasonable doubt that either (a) McKinney was shot in Fond du Lac county, or (b) McKinney died in Fond du Lac county. Appellant contends that the evidence is insufficient to prove either.

It is undisputed that McKinney's body was found on the Dombrowski farm located in Fond du Lac county. It was also established that the cause of death was a bullet wound to the head with secondary brain damage and hemorrhage. In addition, the pathologist who performed the autopsy on the body testified that the victim probably died about an hour after being shot, that the body would stop bleeding at death, and that although the human body normally contains approximately 7,000 cc's

---

[23] *See* Black's Law Dictionary (4th ed.), "venue" pp. 1727, 1728.

[24] *See Smazal v. State* (1966), 31 Wis. 2d 360, 362, 142 N. W. 2d 808; *State v. Wiedenfeld* (1938), 229 Wis. 563, 282 N. W. 621; *Davis v. State* (1908), 134 Wis. 632, 115 N. W. 150.

of blood, the victim's body contained only 70 cc's. Also, it was established that there was no blood in the area where the victim's body was found and that the victim had type O blood. Furthermore, it was established that the time of death was sometime between the hours of 1 a. m. and 1 p. m. on September 11, 1967. From 4 a. m. until after 6 a. m., a red car was parked next to the disabled Dodge on the Dombrowski farm. The Dodge had been continuously parked on the farm from September 10, 1967, until after the body was found. The backseat of the Dodge was saturated with a massive quantity of type O human blood. In fact there was so much blood that it had seeped down onto the lower frame of the car.

From this evidence the jury was eminently justified in concluding: that the victim was shot in the back seat of the disabled Dodge in Fond du Lac county sometime between the hours of 1 a. m. and 1 p. m. on September 11, 1967; that the victim thereafter hemorrhaged profusely until he died about an hour after being shot; and that the body, which after death stopped bleeding, was then removed to the dump area on the farm. The white sock which was found in the back seat of the Dodge and its mate which was found in the area where the body was found, although it was not established that these belonged to either the appellant or the victim, are probative to connect the back seat of the Dodge and the dump. The portions of the rear floor mat, Exhibits Nos. 13 and 32, that matched and fit together are probative of the fact that the part of the floor mat was moved from the 1960 Dodge to the trunk of the Thunderbird.

The defense attempted to explain the huge quantity of type O blood found in the Dodge by having appellant's wife testify that her daughter had suffered nosebleeds in the Dodge. This explanation would seem to be patently incredible when it is recognized that the daughter's blood type was never established, that the Dodge had

been disabled and parked on the farm in Fond du Lac since September 10th, and that the blood on some of the items was not yet dry when the body was found.

These above factors inexorably lead to the conclusion that the victim was murdered in Fond du Lac county beyond *any* reasonable doubt.

B. *Relationship of deceased and appellant*

The closest the state came to directly showing that the appellant and the victim were ever together or even knew each other was through the testimony of McKinney's sister and girl friend. Both testified that they dropped McKinney off at a tavern in Chicago during the morning of September 9, 1967. It was established that the appellant was in the tavern at this time. Although no witness was produced who testified as to seeing the victim and appellant together, it could be inferred from the other testimony that they were together at the tavern.

However, despite the thinness of the state's evidence of prior relationship of McKinney and the appellant, the circumstances surrounding the finding of McKinney's body on the Dombrowski farm and the many items of physical evidence tying in the 1960 Dodge and Thunderbird with the homicide, all point to the inevitable conclusion that Dombrowski murdered McKinney and left his body at the Dombrowski farm.

Appellant raises two other legal issues concerning the conduct of his trial, each of which deserves comment here and neither of which presents error that would compel us to order a new trial. These issues are:

Was the testimony of Attorney Schloemer violative of appellant's statutory right to have communications between attorney and client privileged from disclosure unless waived by the client? (III, *infra*)

Were the remarks made by the prosecuting attorney during closing argument so prejudicial as to require a mistrial? (IV, *infra*)

III. Privileged Communications.

While the appellant was in the hospital on September 12, 1967, and under arrest on the drunken driving charge, he contacted Attorney Clyde Schloemer of West Bend to represent him. Attorney Schloemer and appellant had a conference at the hospital after which Attorney Schloemer indicated to the authorities that a body could be found on the Dombrowski farm dump area.

At the subsequent grand jury investigation into the victim's death, Attorney Schloemer was called to testify about communications made to him by the appellant regarding the location of the victim's body. At that time Attorney Schloemer refused to answer on the grounds that to do so would be to breach the attorney-client relationship and to divulge privileged information. An alternative writ of prohibition was obtained from this court and a hearing was held. By order dated March 8, 1968, this court ordered Attorney Schloemer to answer the following question:

"Did Mr. Dombrowski indicate to you that he wanted a communication made to a third party?"

This court further ordered that in the event the question was answered in the affirmative, a limited further inquiry might issue.

At the trial when Attorney Schloemer was again called to testify, the trial court ordered him to answer the same question authorized by this court. Appellant now contends this was error.

Sec. 885.22, Stats., provides:

"**Communications to attorneys.** An attorney or counselor at law shall not be allowed to disclose a communication made by his client to him, or his advice given thereon in the course of his professional employment. This prohibition may be waived by the client, and does not include communications which the attorney needs to divulge for his own protection, or the protection of those with whom he deals, *or which were made to him for the express pur-*

*pose of being communicated to another,* or being made public." (Emphasis added.)

By propounding the quoted question, this court obviously felt that this would establish whether appellant waived this privilege. Attorney Schloemer's affirmative answer indicates a waiver. The trial court committed no error in this regard.

IV. IMPROPER ARGUMENT.

The victim was killed by a .38-caliber bullet which was rifled with six lands and grooves to the left. The appellant had registered to him two .38-caliber Colt revolvers with the Chicago police department. Colt revolvers, along with other .38-caliber guns, are rifled with six lands and grooves to the left.

The prosecutor, in the rebuttal portion of his closing argument, said:

". . . Mr. Leichtfuss inferred about the .38 caliber. Why, yes, there are different manufacturers. Simple way to answer this—Mr. Mauer gave it to us—all the defendant had to do was produce the gun."

Defense counsel immediately objected to this statement, which objection the trial court sustained, admonishing the prosecutor to discontinue any further reference to what the defendant may have been called upon to produce. The jury was instructed to disregard the comment.

Subsequently, the trial court again admonished the jury to disregard the comment and also gave a special instruction on this subject.

The record clearly shows that while the remark by the prosecutor was improper, corrective instructions were given and we do not believe that it would be probable that had the remark not been made, a different result would have obtained. Thus, although it may be error, it was harmless error.

We are satisfied from our careful review of the long record in this murder prosecution that counsel vigor-

ously fought to protect the interests of the appellant, and that even though the evidence that led to his conviction was circumstantial, we have seldom seen a stronger collection of such evidence assembled and presented by the prosecution.

*By the Court.*—Judgment affirmed.