STATE of Wisconsin, Plaintiff-Respondent,

v.

Todd Lee KRAMER,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2007AP1834–CR. Oral Argument November 6, 2008.
—Decided January 29, 2009.*

2009 WI 14

(Also reported in 759 N.W.2d 598.)

For the defendant-appellant-petitioner there were briefs by *Stephen J. Eisenberg, Marsha M. Lysen,* and *Eisenberg Law Offices, S.C.,* Madison, and oral argument by *Marsha M. Lysen.*

For the plaintiff-respondent the cause was argued by *Sarah K. Larson,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. We review a decision of the court of appeals[1] that affirmed the circuit court's judgment[2] convicting Todd Lee Kramer (Kramer) of operating a motor vehicle while under the influence of an intoxicant. In upholding the judgment of conviction, the court of appeals affirmed the circuit court's denial of Kramer's motion to suppress evidence of his intoxicated state obtained subsequent to a police officer's stopping his squad car, with its emergency overhead lights on, behind Kramer's legally parked vehicle and approaching his driver-side window. This appeal focuses on whether the circuit court erred in its denial of Kramer's suppression motion.

¶ 2. Kramer and the State have briefed two issues for purposes of our review: (1) whether Kramer, whose vehicle was legally parked on the side of the road

---

[1] *State v. Kramer,* 2008 WI App 62, 311 Wis. 2d 468, 750 N.W.2d 941.

[2] The Honorable James O. Miller of Columbia County presided.

with its hazard lights on, was seized without either probable cause or reasonable suspicion, within the meaning of the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution, when the officer activated his police cruiser's emergency overhead lights and pulled up behind Kramer's vehicle; and (2) if such a seizure did occur, whether the officer's conduct fell within the scope of his community caretaker function.

¶ 3. We elect not to resolve the first issue, and assume, without deciding, that a seizure occurred in this case, and that it was not supported either by probable cause or by reasonable suspicion. We therefore decide only the second issue, concluding that the officer's conduct fell within the scope of his community caretaker function. Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND[3]

¶ 4. Kramer's vehicle was legally parked on the side of County Highway J near Lodi at 8:45 p.m. The sun had set and it was dark outside. The vehicle's hazard lights were activated. According to Kramer, he had parked on the side of the road in order to make a phone call, and had activated his hazard lights because he was parked at the crest of a hill and was concerned about his visibility with respect to other traffic on the highway.

¶ 5. While Kramer was parked, Columbia County Sheriff Deputy Todd Wagner (Wagner) passed Kramer's vehicle. Wagner executed a U-turn, activated his police cruiser's emergency overhead lights and stopped behind

---

[3] The following facts are undisputed for purposes of our review.

Kramer's vehicle. At the suppression hearing, Wagner testified that his reason for stopping was to "check to see if there actually was a driver, [and to] offer any assistance." In addition, Wagner testified that "when a car is on the shoulder on the side of the road with [its] hazards on, there [are] typically vehicle problems." Finally, Wagner testified that he activated his emergency lights based on "[s]afety considerations so other traffic could see me."

¶ 6. After Wagner pulled up behind Kramer's vehicle, he exited his police cruiser. While approaching Kramer's driver-side window, Wagner shined a flashlight through the rear window and placed his hand on his holstered gun. When asked why he did so, Wagner testified, "I always do that for safety considerations. I don't know who is in the vehicle or what the situation dictates. I am just at the ready." When asked if he was concerned that a crime might be taking place, Wagner testified, "It was in my mind. I'm not sure any time I come upon a vehicle what the situation is so . . ., yes." When asked if he thought someone was doing something illegal in the car, Wagner testified, "I wasn't sure what was being done in the car. So like I said, any of those situations were always in my mind."

¶ 7. Once Wagner reached Kramer's driver-side window, he said something to the effect of "Hi. Can I help you with something?" and "Just making sure no vehicle problems." Based on Kramer's responses, Wagner became aware that Kramer was intoxicated. Wagner testified, "His speech was slurred. I could smell an odor of intoxicants coming from within the vehicle." Kramer was arrested for operating a motor vehicle while under the influence of an intoxicant.

¶ 8. At trial, Kramer moved to suppress evidence of his intoxication, arguing that Wagner's activation of

his emergency overhead lights while pulling up behind Kramer's car constituted a seizure under the Fourth Amendment and Article I, Section 11 of the federal and state Constitutions, respectively. Kramer additionally argued that this seizure, which was supported by neither probable cause nor reasonable suspicion, was not justified by the community caretaker function.

¶ 9. Without expressly deciding the seizure question, the circuit court denied Kramer's motion to suppress, holding that Wagner's conduct was justified by the community caretaker function. The circuit court based its decision on the court of appeals' test set out in *State v. Anderson*, 142 Wis. 2d 162, 167, 417 N.W.2d 411 (Ct. App. 1987) (*Anderson I*), and adopted by the lead opinion in *State v. Kelsey C.R.*, 2001 WI 54, ¶ 35, 243 Wis. 2d 422, 626 N.W.2d 777 (citing *Anderson I*, 142 Wis. 2d at 169). Kramer was convicted of driving while intoxicated. He appealed the circuit court's denial of his suppression motion.

¶ 10. The court of appeals affirmed the circuit court's judgment of conviction. *State v. Kramer*, 2008 WI App 62, ¶ 1, 311 Wis. 2d 468, 750 N.W.2d 941. In its analysis, the court of appeals expressly assumed, without deciding, that a seizure had taken place. *Id.*, ¶ 42. The court also assumed that the seizure was supported by neither probable cause nor reasonable suspicion. *Id.*, ¶ 9. The court concluded, however, that the seizure was lawful because it fell within the scope of Wagner's community caretaker function. *Id.*

¶ 11. A primary question the court of appeals addressed was whether evidence of Wagner's subjective belief that criminal activity might be taking place operated to preclude his conduct from coming within the scope of his community caretaker function. *Id.*, ¶ 13. The answer to this question turned on the court

of appeals' prior interpretations of the following language from the United States Supreme Court's decision in *Cady v. Dombrowski*, 413 U.S. 433 (1973):

> Local police officers ... frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Id.* at 441.

¶ 12. According to the court of appeals, several of its prior decisions could be read as interpreting the term, "totally divorced," to mean that a police officer could not validly execute his or her community caretaker function if he or she had any subjective law enforcement motivation for the actions taken. *Id.*, ¶¶ 14, 39. The court of appeals reasoned that these decisions may be contrary to other Wisconsin and United States Supreme Court Fourth Amendment decisions, which had uniformly evaluated police conduct objectively. *Id.*, ¶ 33. Because of this potential conflict, the court of appeals urged that we explain the analysis for a community caretaker function that addresses whether a police officer's subjective motivations may be considered. *Id.*, ¶ 30.

¶ 13. The court of appeals evaluated Wagner's conduct under community caretaker criteria that take into account an officer's subjective motivation. *Id.*, ¶ 14. Although the court acknowledged that Wagner had some generalized concerns that criminal activity might be taking place, it held that the terms "totally divorced" employed in *Cady* "cannot mean that an officer must have subjectively ruled out all possibility of criminal activity in order to act in a community caretaker capacity." *Id.*, ¶ 15. The court noted that to hold

otherwise would mean that "the situations in which an officer could lawfully perform valuable community caretaker services would be few and far between." *Id.*, ¶ 16.

¶ 14. As a result, the court held that Wagner's subjective belief that criminal activity might be taking place did not, in and of itself, cause the seizure to become unlawful under its community caretaker analysis. *Id.*, ¶ 17. Therefore, since the court concluded that Wagner's conduct was lawful under the three-step analysis described in *Anderson I*, the court of appeals affirmed the denial of Kramer's motion to suppress and upheld the circuit court's judgment of conviction. *Id.*, ¶ 42.

¶ 15. We granted review and now affirm.

## II. DISCUSSION

### A. Standard of Review

¶ 16. Whether police conduct constitutes a violation of the Fourth Amendment or Article I, Section 11 of the federal and state Constitutions is a question of constitutional fact that we review independently. *State v. Arias*, 2008 WI 84, ¶ 11, 311 Wis. 2d 358, 752 N.W.2d 748 (citing *State v. Griffith*, 2000 WI 72, ¶ 23, 236 Wis. 2d 48, 613 N.W.2d 72). Accordingly, we independently review whether an officer's community caretaker function satisfies the requirements of the Fourth Amendment and Article I, Section 11 of the federal and state Constitutions. *Kelsey C.R.*, 243 Wis. 2d 422, ¶ 34.

### B. General Principles

¶ 17. If Wagner's conduct constituted a seizure made without probable cause or reasonable suspicion, then whether that conduct violated the Fourth Amend-

ment of the United States Constitution[4] or Article I, Section 11 of the Wisconsin Constitution[5] depends on whether Wagner's interaction with Kramer as a community caretaker was reasonable. *Kelsey C.R.*, 243 Wis. 2d 422, ¶ 34. The State bears the burden of proving that the officer's conduct fell within the scope of a reasonable community caretaker function. *State v. Ziedonis*, 2005 WI App 249, ¶ 15, 287 Wis. 2d 831, 707 N.W.2d 565.

¶ 18. Historically, we generally have interpreted Article I, Section 11 to provide the same constitutional guarantees as the Supreme Court has accorded through its interpretation of the Fourth Amendment. *Arias*, 311 Wis. 2d 358, ¶ 20. We have interpreted Article I, Section 11 to provide the same constitutional guarantees as the Fourth Amendment provided even before the Supreme Court's decision in *Mapp v. Ohio*, 367 U.S. 643 (1961), applied the Fourth Amendment's guarantees to the states under the Fourteenth Amendment.[6]

---

[4] The Fourth Amendment of the United States Constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

[5] Article I, Section 11 of the Wisconsin Constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated . . . ."

[6] Our coordination of Article I, § 11 with the Supreme Court's Fourth Amendment jurisprudence began long before we were required to follow the Supreme Court's Fourth Amendment jurisprudence by its decision in *Mapp v. Ohio*, 367 U.S. 643 (1961). For example, in *Hoyer v. State*, 180 Wis. 407, 193 N.W. 89 (1923), we excluded evidence that was obtained in violation of Hoyer's constitutional rights under Article I, [§ 8 and] § 11 of the Wisconsin Constitution, an

*Arias*, 311 Wis. 2d 358, ¶ 20. On only one occasion in our development of Article I, Section 11 jurisprudence have we required a showing different from that required by the Supreme Court's Fourth Amendment jurisprudence. We did so in regard to our development of a good faith exception under Article I, Section 11. *State v. Eason*, 2001 WI 98, 245 Wis. 2d 206, 629 N.W.2d 625 (creating two additional requirements under Article I, Section 11 for law enforcement before according a good faith exception to their reliance on a defective no-knock search warrant). *Eason* has no application here. Pursuant to our usual practice, we shall interpret the provisions of the Fourth Amendment and Article I, Section 11 as equivalent in regard to community caretaker analyses.

## C. The Community Caretaker Function

¶ 19. The community caretaker function has its origins in *Cady*.[7] In *Cady*, the police had conducted a warrantless search of Dombrowski's vehicle following

interpretation consistent with the United States Supreme Court's use of the exclusionary rule under the Fourth Amendment. *Hoyer*, 180 Wis. at 412 (citing *Amos v. United States*, 255 U.S. 313 (1921)).

*State v. Arias*, 2008 WI 84, ¶ 20, 311 Wis. 2d 358, 752 N.W.2d 748.

[7] Interestingly, *Cady* itself has its origins in the Wisconsin murder prosecution of Chester Dombrowski. *State v. Dombrowski*, 44 Wis. 2d 486, 489–92, 171 N.W.2d 349 (1969). Dombrowski was convicted in Fond du Lac County Circuit Court, a judgment that we later affirmed. *Id.* at 507. Following our decision, Dombrowski petitioned for habeas review in federal district court, which was denied. However, the Seventh Circuit reviewed the denial of habeas and reversed Dombrowski's conviction on constitutional grounds. *Dombrowski v. Cady*, 471

an accident. *Cady*, 413 U.S. at 442. The search was conducted according to standard police protocol. Law enforcement attempted to locate a service revolver that Dombrowski, a Chicago police officer, was known to possess. Law enforcement did so in order to "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Id.* at 443. The court noted that taking possession of Dombrowski's vehicle had been necessary to remove the vehicle from the road because it was causing a hazard, and Dombrowski was unavailable to move it himself, due to his intoxication and the injuries he suffered in the accident. *Id.* at 442–43. Based on these circumstances, the court held that the police conduct was justified under the following rationale:

> Local police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Id.* at 441.

¶ 20. We first discussed the community caretaker exception to the prohibition against seizures that were not based on probable cause in *Bies v. State*, 76 Wis. 2d 457, 251 N.W.2d 461 (1977). In *Bies*, the issue was whether a police officer reasonably seized certain evidence of theft under the plain sight doctrine. *Id.* at 463. There, the officer came upon the evidence while inves-

F.2d 280 (7th Cir. 1972). The United States Supreme Court then granted certiorari, and its decision explained the community caretaker function that we discuss here. *Cady v. Dombrowski*, 413 U.S. 433, 434–35 (1973).

tigating a noise complaint; he was not involved in investigating theft. We noted that:

> Checking noise complaints bears little in common with investigation of crime. As a general matter it is probably more a part of the "community caretaker" function of the police which, while perhaps lacking in some respects the urgency of criminal investigation, is nevertheless an important and essential part of the police role.

*Id.* at 471. Even though the officer in *Bies* did not have a warrant for his investigation of the garage where evidence of a crime was observed, we concluded that his conduct was reasonable under the Fourth Amendment because he had a lawful reason to look into the open garage door under his community caretaker function of investigating a noise complaint. *Id.* at 471–72.

¶ 21. Subsequently, the court of appeals set out a three-step test for evaluating claims of police community caretaker functions in *Anderson I*, which we conclude provides a satisfactory analysis. *Anderson I* explained this test:

> [W]hen a community caretaker function is asserted as justification for the seizure of a person, the trial court must determine: (1) that a seizure within the meaning of the fourth amendment has occurred; (2) if so, whether the police conduct was bona fide community caretaker activity; and (3) if so, whether the public need and interest outweigh the intrusion upon the privacy of the individual.[8]

---

[8] *State v. Anderson*, 142 Wis. 2d 162, 417 N.W.2d 411 (Ct. App. 1987) (*Anderson I*), the case which laid out the community caretaker three-step test, remanded proceedings to the circuit court for additional findings. The circuit court's decision was

*Anderson I*, 142 Wis. 2d at 169. This three-step test was applied in the lead opinion in *Kelsey C.R.*, 243 Wis. 2d 422, ¶ 35, and it has been applied in subsequent court of appeals opinions. *See, e.g., Ziedonis*, 287 Wis. 2d 831, ¶ 14; *State v. Paterson*, 220 Wis. 2d 526, 533–34, 583 N.W.2d 190 (Ct. App. 1998).

## D. Application of the Three-step Test

### 1. Seizure requirement

¶ 22. Here, the parties do not dispute that the only conduct that might have constituted a seizure was Wagner's activation of his police cruiser's emergency overhead lights while pulling up behind Kramer's legally-parked vehicle. While it is entirely possible that upon analysis this conduct may *not* constitute a seizure, see *State v. Young*, 2006 WI 98, ¶¶ 65–67, 294 Wis. 2d 1, 717 N.W.2d 729, we do not decide this issue. Instead, for

---

subsequently appealed in *State v. Anderson*, 149 Wis. 2d 663, 439 N.W.2d 840 (Ct. App. 1989) (*Anderson II*), which applied the same community caretaker test espoused in *Anderson I. Id.* at 680–83. We reviewed *Anderson II* in *State v. Anderson*, 155 Wis. 2d 77, 454 N.W.2d 763 (1990) (*Anderson III*), and ultimately reversed the decision of the court of appeals. *Anderson III*, 155 Wis. 2d at 89. However, our decision in *Anderson III* did not rely on nor address the parties' community caretaker arguments or the framework utilized by the court of appeals in *Anderson I* and *Anderson II. Id.* at 88. In addition, we note that the lead opinion in *Kelsey C.R.*, 2001 WI 54, 243 Wis. 2d 422, 626 N.W.2d 777, applied the *Anderson I* three-step test to a community caretaker assertion.

We do not address the effect of the sequence of the proceedings in the *Anderson* series of cases on the precedential value of the community caretaker three-step test set out in *Anderson I*, and instead, we choose to expressly adopt the lead opinion in *Kelsey C.R.* and the three-step test *Kelsey C.R.* employed.

purposes of our analysis, we will assume, without deciding, that a seizure took place for which there was neither probable cause nor reasonable suspicion. Accordingly, the first step of the three-step test is satisfied.

2. Bona fide community caretaker function

¶ 23. The second step requires that in order for police conduct to be upheld, the officer must be engaged in a bona fide community caretaker function. *Kelsey C.R.*, 243 Wis. 2d 422, ¶ 35. It is during the application of this second requirement that a court considers whether police conduct is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441; *see also Kelsey C.R.*, 243 Wis. 2d 422, ¶ 34.

¶ 24. As the court of appeals noted, "[t]here is no dispute that, but for [some of] the officer's *subjective* concerns when he approached Kramer's truck, the officer was acting in [a bona fide] community caretaker capacity when the [alleged] seizure occurred." *Kramer*, 311 Wis. 2d 468, ¶ 13 (emphasis in original). We agree with that assessment. Therefore, the central question we need to consider with respect to this requirement is what effect, if any, an officer's subjective concerns may have on the assessment of whether his action was a bona fide community caretaker function.

¶ 25. Kramer argues that the "totally divorced" language from *Cady* means that the officer must have ruled out any possibility of criminal activity before the community caretaker function is bona fide. The State, on the other hand, acknowledges that while the subjective intent of the officer may be relevant, it is not dispositive, constituting merely one factor among many

429

to be considered in the totality of the circumstances. We conclude that the State's view better comports with the requirements of the Fourth Amendment and Article I, Section 11.

¶ 26. The court of appeals cited to United States Supreme Court opinions when expressing its concern that an officer's subjective motivation may be irrelevant due to the objective standard that applies in a Fourth Amendment context. *Id.*, ¶¶ 14, 31 (citing *Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006); *Whren v. United States*, 517 U.S. 806 (1996)). In *Stuart*, the Supreme Court stated, "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' The officer's subjective motivation is irrelevant." *Stuart*, 547 U.S. at 404 (emphasis in original; citation omitted). *Whren* noted that prior case law "foreclose[s] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved . . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813.

¶ 27. At first blush, the above-quoted statements from *Stuart* and *Whren* seem quite broad and potentially preclude consideration of an officer's subjective intent when a Fourth Amendment violation is claimed. However, *Whren* provides a clear explanation for its approach:

> We are reminded that in *Florida v. Wells*, 495 U.S. 1, 4 (1990), we stated that "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence"; that in *Colorado v. Bertine*, 479 U.S. 367, 372 (1987), in approving an inventory search, we apparently thought it significant that there

had been "no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation"; and that in *New York v. Burger*, 482 U.S. 691, 716–717, n. 27 (1987), we observed, in upholding the constitutionality of a warrantless administrative inspection, that the search did not appear to be "a 'pretext' for obtaining evidence of . . . violation of . . . penal laws." But only an undiscerning reader would regard these cases as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred. In each case we were addressing the validity of a search conducted in the absence of probable cause.

*Id.* at 811 (footnotes omitted). That is, when an officer's Fourth Amendment search and seizure conduct is supported by an objectively ascertainable basis for probable cause or reasonable suspicion, the police conduct meets the Fourth Amendment's requirement of reasonableness, thereby causing subjective motivations to be of little concern. However, when a search or seizure is not supported by probable cause or reasonable suspicion and it is contended that the reasonableness of police conduct stands on other footing, an officer's subjective motivation is a factor that may warrant consideration. *See* 2 Wayne R. Lafave et al., *Criminal Procedure* § 3.1(d) (3d ed. 2007) (noting that the pretextual, subjective motivations of police officers may be considered when the police conduct takes place in the absence of probable cause) (citing *Whren*, 517 U.S. at 811); *cf.* 1 Wayne R. Lafave et al., *Criminal Procedure* § 1.4(f) (3d ed. 2007) (generally criticizing the *Whren* decision).

¶ 28. Although the cases cited in *Whren* were all search cases, the court further distinguished them in order to analyze the police seizure at issue in *Whren*. *Whren*, 517 U.S. at 811–12; *see also infra* note 8. *Whren* further stated:

[In *Delaware v. Prouse*, 440 U.S. 648, 661 (1979), expressing concern about police pretext,] the police action in question was a random traffic stop for the purpose of checking a motorist's license and vehicle registration, a practice that—like the practices at issue in the inventory search and administrative inspection cases upon which petitioners rely in making their "pretext" claim—involves police intrusion *without the probable cause that is its traditional justification.* Our opinion in *Prouse* expressly distinguished the case from a stop based on precisely what is at issue here: "probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations."

*Id.* at 817 (emphasis in *Whren*; citation omitted).

¶ 29. The reasoning of *Whren* is not inconsistent with the analysis in a community caretaker context, since police conduct is not based on probable cause or reasonable suspicion when a community caretaker function is ongoing. *See State v. Anderson*, 155 Wis. 2d 77, 88, 454 N.W.2d 763 (1990) (*Anderson III*) (not addressing whether the community caretaker function provided a basis for the police conduct at issue because the conduct at issue in *Anderson III* was independently supported by reasonable suspicion).

■

¶ 30. When evaluating whether a community caretaker function is bona fide, we examine the totality of the circumstances as they existed at the time of the police conduct. *Cady*, 413 U.S. at 440; *Kelsey C.R.*, 243 Wis. 2d 422, ¶ 37. In so doing, we conclude that the "totally divorced" language from *Cady* does not mean that if the police officer has any subjective law enforcement concerns, he cannot be engaging in a valid community caretaker function. Rather, we conclude that in a community caretaker context, when under the total-

ity of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns.

¶ 31. In some respects, our analysis is similar to the analysis described in *Whren*. It is similar because in both a determination of probable cause to arrest, such as *Whren*, and in a community caretaker context, as we have in the case before us, when an objectively reasonable basis for probable cause or the community caretaker function exists, an officer's subjective motivations do not negate either the probable cause determination or the determination that the community caretaker function was bona fide. However, our analysis of the community caretaker function is also distinct from an analysis of whether there exists probable cause to arrest. In a probable cause analysis, the subjective intent of the officer plays no role in the totality of the circumstances that a court considers in determining whether there is probable cause to arrest. *Whren*, 517 U.S. at 813. In our community caretaker analysis, it constitutes a factor that may be considered in the totality of the circumstances.

¶ 32. In regard to our community caretaker analysis, the nature of a police officer's work is multifaceted. An officer is charged with enforcing the law, but he or she also serves as a necessary community caretaker when the officer discovers a member of the public who is in need of assistance. As an officer goes about his or her duties, an officer cannot always ascertain which hat the officer will wear—his law enforcement hat or her community caretaker hat. For example, an officer may come upon what appears to be a stalled vehicle and decide to investigate to determine if assistance is needed; however, the investigation may show

that a crime is being committed within the vehicle. Therefore, from the point of view of the officer, he or she must be prepared for either eventuality as the vehicle is approached. Accordingly, the officer may have law enforcement concerns, even when the officer has an objectively reasonable basis for performing a community caretaker function.

¶ 33. To conclude otherwise would ignore the multifaceted nature of police work and force police officers to let down their guard and unnecessarily expose themselves to dangerous conditions. *See, e.g., Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997) ("Regrettably, traffic stops may be dangerous encounters. In 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops."); *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) ("[W]e have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. 'According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile.' ") (quoting *Adams v. Williams*, 407 U.S. 143, 148 n.3 (1972)); *State v. Ellenbecker*, 159 Wis. 2d 91, 97, 464 N.W.2d 427 (Ct. App. 1990) ("[E]ven seemingly innocent activity, such as refueling a disabled car, could later turn out to be theft of a car that was left on the shoulder of the highway."); Charles Remsberg, *The Tactical Edge: Surviving High-Risk Patrol* 271–72 (Calibre Press 1988) (noting that officers approaching vehicles typically know nothing about the threat level passengers may pose, because they know nothing about the passengers themselves, and the officers thus expose themselves to considerable danger).

¶ 34. Furthermore, to interpret the "totally divorced" language in *Cady* to mean that an officer could

not engage in a community caretaker function if he or she had any law enforcement concerns would, for practical purposes, preclude police officers from engaging in any community caretaker functions at all. This result is neither sensible nor desirable.

¶ 35. Accordingly, we do not read the "totally divorced" language from *Cady* as broadly as Kramer suggests. Instead, we conclude that *Cady* was merely *observing* that community caretaker functions are "totally divorced" from an officer's law enforcement function because a different facet of police work is paramount in a community caretaker function than is paramount in a law enforcement function. In our view, the concurrence in an Illinois Court of Appeals decision, *People v. Cordero*, 830 N.E.2d 830 (Ill. Ct. App. 2005), correctly interpreted the "totally divorced" language from *Cady* as the Supreme Court's "noting that many police-citizen encounters have nothing to do with crime, not [as] requiring that they must have nothing to do with crime." *Id.* at 841 (O'Malley, P.J., concurring).

██

¶ 36. Therefore, we conclude that a court may consider an officer's subjective intent in evaluating whether the officer was acting as a bona fide community caretaker; however, if the court concludes that the officer has articulated an objectively reasonable basis under the totality of the circumstances for the community caretaker function, he has met the standard of acting as a bona fide community caretaker, whose community caretaker function is totally divorced from law enforcement functions. Furthermore, applying an objective standard, while considering subjective concerns, is consistent with our past jurisprudence in determining the reasonableness of an officer's actions in regard to a protective frisk for weapons:

The officer's [subjective] fear or belief . . . is but one factor in the totality of the circumstances that a court may consider in determining whether an [officer's conduct was objectively reasonable].

*State v. Kyles*, 2004 WI 15, ¶ 39, 269 Wis. 2d 1, 675 N.W.2d 449.[9] We now consider whether Wagner conducted a bona fide community caretaker function in this case.

¶ 37. We conclude that Wagner had an objectively reasonable basis for deciding that a motorist may have been in need of assistance when he stopped behind Kramer's vehicle. Kramer was parked on the side of a highway after dark with his hazard flashers operating. It was Wagner's experience that when a vehicle is parked on the side of the road with its hazard flashers operating, typically there is a vehicle problem. His first contact with Kramer was to offer assistance. He said, "Hi. Can I help you with something?" and "Just making sure no vehicle problems."

---

[9] *State v. Kyles*, 2004 WI 15, ¶ 39, 269 Wis. 2d 1, 675 N.W.2d 449, also states that "[s]ometimes an officer's perceptions will help sustain the objective reasonableness of [his or her conduct]. Other times, these perceptions may undercut a conclusion of reasonableness." This language should not be read to conclude that the subjective belief of an officer may provide the court with sufficient evidence of probable cause or reasonable suspicion when there is an insufficient objectively reasonable basis for that conclusion. Were the above quote from *Kyles* read otherwise, the rights of the defendant under the United States Constitution would be undercut because probable cause and reasonable suspicion would not be determined on an objectively reasonable basis and our decision in *Kyles* would be in conflict with *Whren v. United States*, 517 U.S. 806 (1996), which states that the "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 813.

¶ 38. Wagner also acknowledged that he did not know what was going on inside the vehicle, or whether there was a driver present. He approached the vehicle with caution, but to do so was standard police procedure, designed to protect an officer who was entering upon an unknown situation. It was only after Kramer spoke that Wagner's concern shifted from his community caretaker function to a law enforcement function.

¶ 39. It is important to note that given the multifaceted nature of police work these two functions are not mutually exclusive. Rather, which function is primary may shift during the course of the officer's interaction with members of the public. In the case before us, it was Wagner's community caretaker function of offering assistance to what could have been a motorist stranded in a stalled vehicle after dark that led to the officer's contact with Kramer. After Kramer began to speak with the officer, it was Wagner's law enforcement function that led to Kramer's arrest for driving while intoxicated. The objectively reasonable basis for Wagner making contact with Kramer was totally divorced from his subjective belief that criminal activity could have been taking place. Furthermore, under the totality of the circumstances, Wagner's subjective belief does not negate his objectively reasonable basis for stopping behind Kramer and contacting him to ascertain if Kramer needed assistance. Accordingly, Wagner's contact with Kramer was a bona fide community caretaker function that was totally divorced from his law enforcement function.

3. The balancing test

¶ 40. Since we have assumed that a Fourth Amendment and Article I, Section 11 seizure occurred, and have concluded that Wagner engaged in a bona fide community caretaker function, we now proceed to con-

sider the third step: whether the officer's exercise of a bona fide community caretaker function was reasonable. *Kelsey C.R.*, 243 Wis. 2d 422, ¶ 35. We do so by balancing a public interest or need that is furthered by the officer's conduct against the degree of and nature of the restriction upon the liberty interest of the citizen.[10] *Arias*, 311 Wis. 2d 358, ¶ 32; *see Kelsey C.R.*, 243 Wis. 2d 422, ¶ 35.

¶ 41. The stronger the public need and the more minimal the intrusion upon an individual's liberty, the more likely the police conduct will be held to be reasonable. In balancing these interests, we consider the following factors:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

*Kelsey C.R.*, 243 Wis. 2d 422, ¶ 36 (quoting *Anderson I*, 142 Wis. 2d at 169–70).

¶ 42. With respect to the first factor, we note that the public has a substantial interest in ensuring that

---

[10] "Although our legal lexicon often presents 'searches and seizures' as an inseparable tandem, the two are constitutionally and analytically distinct. . . . A seizure differs from a search, as it 'deprives the individual of dominion over his or her person or property.' " *Arias*, 311 Wis. 2d 358, ¶ 25 (quoting *Horton v. California*, 496 U.S. 128, 133 (1990)). A search invades different constitutionally protected interests—the privacy interests of a person. *Id.*, ¶ 31.

police assist motorists who may be stranded on the side of a highway, especially after dark and outside of an urban area when help is not close at hand. *State v. Goebel*, 103 Wis. 2d 203, 208, 307 N.W.2d 915 (1981) (noting that when police stop to assist motorists, such contact is "not only authorized, but constitute[s] an important duty of law enforcement officers"); *Ziedonis*, 287 Wis. 2d 831, ¶ 29 (holding that the "officers' fear for the safety of the occupant" was a significant public interest supporting community caretaker function, because "the officers did not know the physical condition of the person and reasonably concluded that the situation was an emergency") (citing *State v. Ferguson*, 2001 WI App 102, ¶ 22, 244 Wis. 2d 17, 629 N.W.2d 788). Since the public has a substantial interest in police offering assistance to motorists who may need assistance, especially after dark and in areas of the state's highways where assistance may not be near at hand, the first factor favors the conclusion that Wagner's community caretaking function was reasonably performed.

¶ 43. In considering the second reasonableness factor, whether the time, location, and degree of authority and force displayed were appropriate under the circumstances, we note that it is hard to imagine Wagner displaying less overt authority, or acting less coercively, than he did in this case. The contact with Kramer to determine his need of assistance was brief. And, although Wagner's activation of his police cruiser's emergency lights may be interpreted as a show of authority, the activation of the lights was also a safety precaution because Kramer had stopped in an unlighted area after dark on a two-lane county highway near the crest of a hill. Wagner wanted to let other drivers know that there were vehicles parked on the

shoulder of the highway. Kramer suggests that Wagner could simply have pulled up along side of his vehicle, rolled down the window and asked if Kramer needed assistance. We conclude that doing so would have required Wagner to stop in the middle of one lane of a two-lane highway. Doing so would have added to the dangerousness of the stop for both Wagner and Kramer, if an inattentive motorist had come to the crest of the hill without appreciating that the officer's vehicle was blocking one lane of traffic. Therefore, we conclude that the second factor weighs in favor of concluding that Wagner's community caretaking function was reasonably performed.

¶ 44. Under the third factor, we consider whether the involvement of an automobile has an effect on whether the community caretaker function was reasonably performed. Here, the officer simply walked up to Kramer's driver-side window and asked if he needed assistance. As we explained in discussing the second factor, that was the only reasonable approach that Wagner could take in performing this community caretaker function. He had to first determine if the vehicle was occupied and if so, to determine if assistance was needed. We conclude that the third factor favors concluding that Wagner reasonably performed his community caretaker function.

¶ 45. Finally, we consider the feasibility and availability of alternatives. Kramer argues that Wagner should have driven past his car, left him alone for a few minutes and then returned later. Only then, Kramer argues, would Wagner have been justified in further determining what was taking place in Kramer's vehicle. We reject Kramer's argument, and conclude that the manner in which Wagner performed his community caretaker function was more reasonable than any sug-

gested by Kramer. For example, if Wagner had left the location in which Kramer was parked and Kramer had stopped due to a health problem, it may have been too late for effective assistance at some later time. If Kramer had been experiencing vehicle problems, Kramer may have exited the vehicle and started to walk along the dark highway. That could have increased his risk of injury. Therefore, we conclude that the fourth factor also favors concluding that Wagner reasonably performed his community caretaker function. All four factors under the third step of the three-step test favor concluding that Wagner reasonably performed his community caretaker function. The third step has been satisfied.

¶ 46. Accordingly, since we assume, without deciding, that a seizure took place and conclude that Wagner was engaged in a bona fide community caretaker function, and that the community caretaker function was reasonably performed under the totality of the circumstances presented in this case, we affirm the decision of the court of appeals.

## III. CONCLUSION

¶ 47. Kramer and the State have briefed two issues for purposes of our review: (1) whether Kramer, whose vehicle was legally parked on the side of the road with its hazard lights on, was seized without either probable cause or reasonable suspicion, within the meaning of the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution, when the officer activated his police cruiser's emergency overhead lights and pulled up behind Kramer's vehicle; and (2) if such a seizure did occur, whether the officer's conduct fell within the scope of his community caretaker function.

¶ 48. We elect not to resolve the first issue, and assume, without deciding, that a seizure occurred in this case, and that it was not supported either by probable cause or by reasonable suspicion. We therefore decide only the second issue, concluding that the officer's conduct fell within the scope of his community caretaker function. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.