J-A02016-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LARRY CRAIG RICHARDSON, JR. | : | |
| | : | No. 1291 WDA 2016 |
| Appellant | | |

Appeal from the Judgment of Sentence July 19, 2016
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0008374-2015

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

DISSENTING MEMORANDUM BY OLSON, J.:  FILED: March 29, 2019

I respectfully dissent from the learned majority.  Although I would vacate Appellant's judgment of sentence and remand for resentencing, I would affirm Appellant's convictions.

On appeal, Appellant primarily contends that the trial court erred when it denied his motion to suppress.  Because the Commonwealth prevailed at the suppression hearing, we "consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole."  ***Commonwealth v. Russo***, 934 A.2d 1199, 1203 (Pa. 2007) (quotations and citations omitted).  Further, as to this issue, "the record" refers to "the evidentiary record that was created at the suppression hearing."  ***Commonwealth v. Cruz***, 166 A.3d 1249, 1254 (Pa. Super. 2017); ***In re L.J.***, 79 A.3d 1073 (Pa. 2013).  Viewed in this manner, the evidence is as follows.

On the afternoon of April 3, 2015, officers from the Ross Township Police Department were surveilling Appellant's residence at 167 North South Drive in Ross Township. N.T. Suppression Hearing, 1/21/16, at 5-7. Appellant's residence was located in an apartment complex known as "the Cascades," which is entered from a road named Cemetery Lane. *Id.* at 5, 23, and 73-74. The officers were conducting their surveillance because they believed Appellant was selling narcotics. *Id.* at 5-7 and 42. The officers did not possess a warrant to search Appellant's property or for Appellant's arrest; however, earlier in the day, the officers confirmed that Appellant's driver's license was suspended, as Appellant had been convicted of driving under the influence ("DUI"). *Id.* at 5-6, 43, and 71-72.[1]

At approximately 2:00 p.m. that day, Police Officer Balazas Devenyi watched Appellant leave his apartment holding a black cloth bag, get into his vehicle alone, and drive away. *Id.* at 6. Officer Devenyi "relayed [this] information [to] the other officers on the detail," which included Police Officer Mark Sullivan and Detective Jason Moss. *Id.* at 8 and 12.

At the time, Officer Sullivan was in uniform and driving a marked police car on Cemetery Lane. *Id.* at 16. Officer Sullivan testified that, at approximately 2:00 p.m., he received a radio call from Detective Moss,

---

[1] Ross Township Police Detective Jason Moss testified that, at 11:03 a.m. on April 3, 2015, he received confirmation that Appellant had a suspended driver's license. N.T. Suppression Hearing, 1/21/16, at 43. However, Detective Moss testified that he "knew back on March 17 that [Appellant] wasn't permitted to legally drive." *Id.* at 70.

declaring "that there was a gentleman driving a . . . silver Range Rover . . . with a suspended [license]" and that the vehicle was "driving up Cemetery Lane." *Id.* at 16-17. Officer Sullivan informed Detective Moss that he would attempt to stop the vehicle. *Id.* at 17-18.

Officer Sullivan observed Appellant's vehicle a "[c]ouple minutes" later. As Officer Sullivan testified:

> I travel up Cemetery Lane and we were stopped at the red light where it intersects with Perry Highway, and a couple cars ahead of me I observe a Range Rover. As we proceed through the red light, the other cars in front of us turned off. I was directly behind the Range Rover. I observed the license as [Detective] Moss had informed me over the radio. . . . [M]aybe 15 seconds after we started moving[,] I initiated a traffic stop. . . . I turned my lights and sirens on. At that point[,] the Range Rover turned left onto the ramp [leading down to Interstate 279] and then pulled over to the side[, coming to a rest on the berm of the Interstate 279 on-ramp].

*Id.* at 18 and 20.

As Officer Sullivan testified, Appellant stopped his vehicle "most of the way off the road out of the lane of travel on the ramp down to [Interstate] 279. His car was two-thirds off the lane of travel onto the berm of the road." *Id.* at 21. However, Appellant's vehicle was "still parked in the lane of travel" and, as Detective Moss testified, Appellant's vehicle posed "a safety hazard to other motorists who [were] operating their vehicle on this roadway." *Id.* at 21 and 48.

When the vehicles came to a stop, Detective Moss arrived on scene in a separate, unmarked vehicle and parked behind Officer Sullivan's patrol car.[2] *Id.* at 46. Officer Sullivan and Detective Moss then approached Appellant's vehicle. *Id.* at 21. As Detective Moss testified:

> I asked [Appellant] if he had a good license. He said that he did. I obtained his license. I informed him he was DUI suspended and I asked him to step from the vehicle. . . . [After Appellant stepped out of the vehicle,] I confirmed that his license was suspended for DUI and [told him] we would need to tow his vehicle.

*Id.* at 48-49.

Detective Moss testified that he did not (and could not) arrest Appellant for driving with a suspended license.[3] *Id.* at 102-103. Rather, Detective Moss

---

[2] Detective Moss testified that he did not stop Appellant's vehicle because he was driving an unmarked police car and he wished for "the marked police vehicle [to] stop" Appellant. N.T. Suppression Hearing, 1/21/16, at 76 and 108 (Detective Moss testified that it is his "preference to have a marked patrol vehicle [] conduct a traffic stop").

[3] Appellant's license was suspended because he was convicted of DUI. Section 1543(b)(1) of the Vehicle Code declares that it is a summary offense to "drive[] a motor vehicle on a highway . . . of this Commonwealth at a time when the person's operating privilege is suspended or revoked . . . because of a violation of . . . [75 Pa.C.S.A. §] 3802" (related to driving under the influence of alcohol or controlled substances). 75 Pa.C.S.A. § 1543(b)(1). Section 6304 of the Vehicle Code, entitled "[a]uthority to arrest without warrant," declares:

> **(a) Pennsylvania State Police.--**A member of the Pennsylvania State Police who is in uniform may arrest without a warrant any person who violates any provision of [the Vehicle Code] in the presence of the police officer making the arrest.

- 4 -

testified that he intended to issue Appellant a citation for the infraction and then, "if it was legally possible," tow the vehicle. *Id.* Further, while Detective Moss testified that the police stopped Appellant because he was driving with a suspended license, Detective Moss testified that the police also "hope[d to] find drugs on him at that time." *Id.* at 71.

As Detective Moss testified on direct examination, after being informed that the police were going to tow his vehicle: "[Appellant] asked if somebody could come and move the vehicle. I asked if they were at Cemetery Lane. He indicated they were not. So I deemed that the person wouldn't be there within a reasonable amount of time." *Id.* at 48-49. Detective Moss immediately clarified that, when he asked Appellant whether "they were at Cemetery

---

**(b) Other police officers.--**Any police officer who is in uniform may arrest without a warrant any nonresident who violates any provision of [the Vehicle Code] in the presence of the police officer in making the arrest.

**(c) Other powers preserved.--**The powers of arrest conferred by this section are in addition to any other powers of arrest conferred by law.

75 Pa.C.S.A. § 6304. Officers from the Ross Township Police Department effected the stop of Appellant's vehicle. Moreover, the evidence is uncontradicted that Appellant was a resident of Pennsylvania and that he lived at 167 North South Drive, in Ross Township. *See*, *e.g.*, N.T. Suppression Hearing, 1/21/16, at 6. Therefore, Detective Moss was correct to declare that he could not arrest Appellant for violating Section 1543(b)(1) of the Vehicle Code and that the proper procedure was to merely issue Appellant a citation for the violation. *Id.* at 103 (Detective Moss testified: "We can't arrest [Appellant] for [driving with a suspended license]. He's cited and pulled over").

Lane," Detective Moss was asking Appellant whether "there would be someone available at [Appellant's] residence to move the vehicle." *Id.* at 50. When Appellant answered "no," Detective Moss "didn't pursue it any further . . . [b]ecause [Detective Moss] deemed that nobody was in close proximity to move that vehicle." *Id.*

However, during cross-examination, Detective Moss partially altered his testimony on this issue. Specifically, Detective Moss testified that, after he informed Appellant that the police were going to tow the vehicle, Appellant said "[c]an my girl or somebody come get it?" *Id.* at 86. Detective Moss testified that, in response, he asked Appellant "[a]re they close?;" when Appellant replied "no," Detective Moss ended the conversation. *Id.* at 85-86.

During his testimony, Detective Moss acknowledged the Ross Township Vehicle Tow Policy and Traffic Enforcement Policy. In fact, Detective Moss testified that he was attempting to follow the policies during his interaction with Appellant. *Id.* at 52. In relevant part, the policies declare:

> **TITLE III      OPERATIONS:**
> **Chapter 9      Vehicle Tow Policy**
>
> **POLICY:**
>
> Incidents often require officers to order that vehicles be towed from the scene and stored by contract towers. The reasons and circumstances of these tows are many and varied. Often times, these tows are ordered against the wishes of the vehicle driver or owner.
>
> This policy is intended to regulate the circumstances under which a vehicle is towed at the direction of the department, the procedures for requesting tows under

various conditions, and guidelines to be followed for placing holds and conducting inventories.

**PROCEDURE:**

901  Reason to Tow

. . .

F) Traffic Violations

(1) Vehicles may be removed from the scene and stored by contract tower following enforcement action pursuant to the criteria set forth in Title III Chapter 14 Traffic Enforcement.

. . .

904 Inventory of Towed Vehicles

A) Inventories Required

(1) All vehicles towed at the direction of department's officers shall be inventoried.

(2) Inventories are the responsibility of the officer requesting, or ordering, the vehicle to be towed.  He may delegate this responsibility to another officer.

B) Method of Inventory

(1) Officers shall inventory the contents of all occupant and cargo spaces that are accessible.

(2) In performing inventory searches, no locked or sealed container shall be forced open.

. . .

(4) Items of significant monetary value shall warrant a more detailed description including, but not limited to, make, model, size, serial numbers, and condition.

(5) Inventory shall include a description of the interior and exterior of the vehicle with particular notation of any visible damage.

C) Inventory Report

(1) Results of inventory shall be documented on the department's Inventory Report form.

(2) Any articles removed from the vehicle after the vehicle has come under the control of the department shall be noted on the Inventory Report, including whom the article was released to. . . .

. . .

(4) All completed reports shall be submitted to the Records Division within 24 hours.  Officers may copy the completed report for inclusion in case or investigative files.

. . .

**Chapter 14 Traffic Enforcement**

. . .

1402 Enforcement Options

F) Disposition of Vehicles

(1) If, as a result of enforcement action, the officer[] finds that a driver is not legally permitted to drive a vehicle on a highway, the officer may:

(a) Permit the driver to arrange for another person to drive the vehicle.  RESTRICTION: The maximum time allotted for removal of a vehicle on the roadway by another person shall be 20 minutes.

. . .

(c) If the vehicle is not on the roadway, the driver may be permitted to arrange to have the vehicle

towed from the location. RESTRICTION: The maximum time allotted for removal by private tower shall be 20 minutes.

. . .

(e) If the vehicle is on the roadway, and driver is unable to comply with (a), the vehicle shall be removed at the officer's direction by contract tower.

Ross Township Vehicle Tow Policy and Traffic Enforcement Policy, at 1-20.

Detective Moss testified that, pursuant to Section 1402(F)(1)(a) of the Ross Township Traffic Enforcement Policy, "in a situation where a vehicle must be towed because the operator doesn't have a license," "we would always" ask the operator whether there was "anyone who was able to come get the car within 20 minutes." N.T. Suppression Hearing, 1/21/16, at 86. Detective Moss testified that he did not specifically ask Appellant "[i]s there anybody who can get here in 20 minutes?" *Id.* at 85-86. However, Detective Moss testified that, in this case, he did not need to ask the question because Appellant had already confirmed that there was no one "close" who could come get the car – and, Detective Moss testified, he deemed this answer to mean that there was no one who could pick up Appellant's vehicle "within that 20-minute time frame." *Id.*

As Detective Moss testified, pursuant to policy, as soon as the police determine that a vehicle is going to be towed, the police are required to

perform an inventory search of the entire vehicle before the vehicle is towed.[4]

*Id.* at 90; *see also* Ross Township Vehicle Tow Policy at § 904(A) and (B).

He testified:

> That is the policy. You have to inventory the vehicle to protect ourselves and the tower of potential liability of items of value are in the car and are potentially stolen either by us or the tower. So we cover ourselves and document everything of value in the vehicle. . . . [T]he parameters of the inventory . . . excludes any locked container. But other than that, it spells out that you are to inventory the entire vehicle.

N.T. Suppression Hearing, 1/21/16, at 54.

Detective Moss testified that it is his standard procedure to inventory the vehicle by, first, either memorizing the contents of the vehicle or "writ[ing the contents] in [his] notebook" prior to the tow; Detective Moss testified that he then completes a standard inventory form "when [he] get[s] back to the station." *Id.* at 89.

Detective Moss testified that, after he determined that Appellant's vehicle was to be towed, he began the inventory search. *Id.* at 87. As Detective Moss testified, "in conducting the inventory search, the first thing that [he] did was go into [Appellant's] car and take the black bag" that the police saw Appellant carry from his residence into his car. *Id.* Detective Moss

---

[4] In accordance with Ross Township Vehicle Tow Policy Section 904, Detective Moss testified that he is required to "inventory the entire vehicle[,] . . . exclud[ing] any locked container." N.T. Suppression Hearing, 1/21/16, at 54. Appellant's black cloth bag was closed by a drawstring and was not locked. *Id.* at 55.

testified that he chose to inventory the black bag first because "[t]o me it was the first logical thing to look for." *Id.* at 87. He testified: "I entered the vehicle and on his passenger side seat was a black drawstring bag. I manipulated that bag. When I looked in it, I saw several bricks of heroin." *Id.* at 55. At that point, Detective Moss "stopped the inventory . . . [so that he could] obtain a search warrant and search the rest of the vehicle for further narcotics" and arrested Appellant. *Id.* at 56.

The vehicle was towed to the police station and a search warrant was later issued for Appellant's vehicle and residence. *Id.* at 58. Appellant's vehicle was later "searched pursuant to the search warrant." *Id.* at 60. In total, the police discovered: approximately 1,250 stamp bags of heroin and nine-and-a-half grams of crack cocaine in the black drawstring bag; $1,262.00 on Appellant's person; and, $18,212.00 at Appellant's residence. *Id.* at 62-63.

The Commonwealth charged Appellant with two counts of possession of a controlled substance with the intent to deliver (hereinafter "PWID"), two counts of possession of a controlled substance, and one count of driving while operating privilege is suspended.[5] Prior to trial, Appellant filed a motion to suppress the evidence against him. Appellant claimed that all of the evidence against him must be suppressed, as the evidence was the product or fruit of

---

[5] 35 P.S. § 780-113(a)(30) and (16) and 75 Pa.C.S.A. § 1543(b)(1), respectively.

an unconstitutional impoundment and search of his vehicle. Appellant's Suppression Motion, 9/23/15, at 1-6. After hearing the above-summarized evidence, the trial court denied Appellant's motion to suppress. Within its later-filed opinion, the trial court declared:

> The record clearly shows that [Appellant] was driving a vehicle when his driver's license was suspended. Officer Sullivan conducted a valid traffic stop to cite [Appellant] for violating the vehicle code. Consistent with departmental policy, [Appellant] was provided with an opportunity to have a local associate retrieve his vehicle. When [Appellant] advised the officers that nobody was available to retrieve the vehicle, [Detective] Moss sought to have the vehicle towed as it was occupying the side of the road on the entry lane to a busy interstate highway. [Detective] Moss dutifully took all necessary steps to remove a safety hazard from the roadway. [The trial court] believes that [Detective] Moss's conduct was consistent with departmental policy. Moreover, pursuant to this same policy, [Detective] Moss was required to conduct an inventory search to protect [Appellant's] property as well as protect himself and others acting on behalf of the government from any risks associated with the care-taking of [Appellant's] property. The inventory search was, therefore, proper.

Trial Court Opinion, 6/22/17, at 5 (emphasis omitted).

On March 31, 2016, Appellant proceeded to a stipulated, non-jury trial. The trial court found Appellant guilty of all charged crimes and, on July 19, 2016, the trial court sentenced Appellant to serve an aggregate term of 60 to 120 months in prison, followed by five years of probation, for his convictions. N.T. Sentencing, 7/19/16, at 30-32. The trial court denied Appellant's post-sentence motion on August 1, 2016 and Appellant filed a timely notice of appeal. Appellant raises two issues on appeal:

[1.] Did the trial court err in denying [Appellant's] suppression motion because police conducted the search for criminal investigatory, rather than non-criminal inventory, purposes?

[2.] Did the trial court issue a manifestly excessive and unreasonable sentence that failed to properly consider and apply all of the relevant sentencing criteria, including the protection of the public, the gravity of the offense, and [Appellant's] character and rehabilitative needs, as required under 42 Pa.C.S.A. § 9721(b) (sentencing generally)[?]

Appellant's Brief at 5.

Appellant first claims that the trial court erred when it denied his suppression motion.

"Once a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights." **Commonwealth v. Wallace**, 42 A.3d 1040, 1047-1048 (Pa. Super. 2012) (*en banc*); **see also** Pa.R.Crim.P. 581(H). With respect to an appeal from the denial of a motion to suppress, our Supreme Court has declared:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing [such a ruling by the] suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record. . . . Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

**Commonwealth v. Eichinger**, 915 A.2d 1122, 1134 (Pa. 2007) (citations omitted).

Appellant claims that the trial court erred when it denied his motion to suppress. According to Appellant, the inventory search of his vehicle was "unconstitutional because [the] police conducted [the search] to investigate the contents of the vehicle for evidence of a crime rather than to safeguard [the contents] from subsequent claims of lost, damaged[,] or stolen property."[6] Appellant's Brief at 23. Specifically, Appellant claims that the inventory search was unconstitutional because, in conducting the search, the police harbored a "criminal investigatory motive." *Id.* at 26. Further, Appellant claims that, since the search of his vehicle was unconstitutional, all of the evidence against him must be suppressed, as it was the product or the fruit of the initial, unconstitutional search. *Id.* at 22-37.

"The Fourth Amendment to the [United States] Constitution and Article I, Section 8 of [the Pennsylvania] Constitution protect citizens from

_____

[6] On appeal, Appellant claims only that the purported inventory search of his vehicle was unconstitutional; Appellant does not claim that the impoundment of his vehicle was invalid or unconstitutional. *See* Appellant's Brief at 5 and 22-37. Further, Appellant does not claim that the initial stop of his vehicle was improper. *See id.* Indeed, Appellant recognizes that the initial stop was proper, as the officers had probable cause to believe that he was driving a vehicle while his operating privilege was suspended, in violation of 75 Pa.C.S.A. § 1543(b)(1). *See id.*; *see also* N.T. Suppression Hearing, 1/21/16, at 64-67 (Appellant acknowledges that the initial stop was valid); *Whren v. United States*, 517 U.S. 806 (1996) (holding: "the constitutional reasonableness of traffic stops [does not] depend[] on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis").

unreasonable searches and seizures."[7]   ***Commonwealth v. McAdoo***, 46 A.3d 781, 784 (Pa. Super. 2012).  "A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies." ***Commonwealth v. Strickler***, 757 A.2d 884, 888 (Pa. 2000).  Some exceptions to the warrant requirement apply where "the police have probable cause to believe a crime has been or is being committed." ***Commonwealth v. Petroll***, 738 A.2d 993, 998-999 (Pa. 1999); ***United States v. Rabinowitz***, 339 U.S. 56 (1950) (search incident to arrest exception); ***Commonwealth v. Gibson***, 638 A.2d 203, 206-207 (Pa. 1994) (exigent circumstances exception); ***Commonwealth v. Gary***, 91 A.3d 102 (Pa. 2014) (automobile exception).  However, "[e]ven absent probable cause, some searches without warrants do not violate state or federal constitutional privacy rights."  ***Petroll***, 738 A.2d at 999.  The latter category includes searches and seizures conducted while the police are acting as community

---

[7] Appellant grounds his claim on appeal entirely in the Fourth Amendment to the United States Constitution; Appellant raises no separate claim for relief under the Pennsylvania Constitution and Appellant does not "argue that the Pennsylvania Constitution offers greater protection [from inventory searches] than does the United States Constitution." ***See Commonwealth v. Baker***, 78 A.3d 1044, 1048 (Pa. 2013); ***see also*** Appellant's Brief at 22-37. Therefore, in analyzing Appellant's claim, I do not separately analyze the claim under the Pennsylvania Constitution. ***See Baker***, 78 A.3d at 1048 (holding that, where the "[a]ppellant [did] not argue that the Pennsylvania Constitution offers greater protection against cruel punishments than does the United States Constitution," the Supreme Court would "not engage in a separate state constitutional review" of the claim); ***Commonwealth v. Wilmer***, 194 A.3d 564, 565 n.1 (Pa. 2018) (same).

caretakers. *See Commonwealth v. Livingstone*, 174 A.3d 609, 625-626 (Pa. 2017).

"The community caretaking doctrine has been characterized as encompassing three specific exceptions: the emergency aid exception; the automobile impoundment/inventory exception; and the public servant exception, also sometimes referred to as the public safety exception." *Id.* at 626-627. With respect to the inventory search exception, our Supreme Court has held:

> The purpose of an inventory search is not to uncover criminal evidence, but to safeguard items taken into police custody in order to benefit both the police and the defendant. In the seminal case of [*South Dakota v. Opperman*, 428 U.S. 364 (1976)], the [United States Supreme] Court observed that inventory searches of impounded vehicles serve several purposes, including (1) protection of the owner's property while it remains in police custody; (2) protection of the police against claims or disputes over lost or stolen property; (3) protection of the police from potential danger; and (4) assisting the police in determining whether the vehicle was stolen and then abandoned.
>
> An inventory search of an automobile is permissible when (1) the police have lawfully impounded the vehicle; and (2) the police have acted in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle. In *Commonwealth v. Henley*, the Pennsylvania Superior Court, citing *Opperman*, explained:
>
> > In determining whether a proper inventory search has occurred, the first inquiry is whether the police have lawfully impounded the automobile, *i.e.*, have lawful custody of the automobile. The authority of the police to impound vehicles derives from the police's reasonable community care-taking functions. Such functions include removing disabled or damaged vehicles from the highway, impounding automobiles which violate parking

> ordinances (thereby jeopardizing public safety and efficient traffic flow), and protecting the community's safety.
>
> The second inquiry is whether the police have conducted a reasonable inventory search. An inventory search is reasonable if it is conducted pursuant to reasonable standard police procedures and in good faith and not for the sole purpose of investigation.
>
> 909 A.2d 352, 359 (Pa. Super. 2006) (*en banc*) (citations omitted). A protective vehicle search conducted in accordance with standard police department procedures assures that "the intrusion [is] limited in scope to the extent necessary to carry out the caretaking function." ***Opperman***, 428 U.S. at 375.

***Commonwealth v. Lagenella***, 83 A.3d 94, 102-103 (Pa. 2013) (some citations omitted); ***see also Colorado v. Bertine***, 479 U.S. 367, 372 (1987) (holding that a vehicle inventory search was valid and declaring that "there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation").

On appeal, Appellant claims that the inventory search was unconstitutional because, in conducting the search, the police harbored a criminal investigatory motive and the inventory search was merely a pretext for an unconstitutional, warrantless investigatory search of the black bag. ***See*** Appellant's Brief at 23 and 34. The majority agrees with Appellant and holds that an officer's "mixed motives" will invalidate an otherwise permissible inventory search. ***See*** Majority Opinion at \*\*24-25. Respectfully, I believe that the majority's holding is incorrect.

- 17 -

At the outset, I acknowledge the precedent from this Court holding that an inventory search is invalid where the search was "coupled with the intent of discovering evidence of a crime." **See Commonwealth v. Brandt**, 366 A.2d 1238, 1241 (Pa. Super. 1976) (holding: "[a]n inventory takes place when it is not coupled with the intent of discovering evidence of a crime"); **Commonwealth v. Landamus**, 482 A.2d 619, 622 (Pa. Super. 1984) (same); **Commonwealth v. Corbin**, 469 A.2d 615, 616-617 (Pa. Super. 1983) (plurality) (declaring that trial counsel was ineffective for failing to file a motion to suppress because, even though the police possessed an objectively valid reason to impound the defendant's vehicle, the purported inventory search was unconstitutional because the police harbored "an investigatory [] motive"); **see also Commonwealth v. Germann**, 621 A.2d 589, 594 (Pa. Super. 1993) ("an inventory search is only excepted from the warrant requirement or probable cause where it is motivated by a desire to safeguard the contents of the vehicle, and not by a design to uncover incriminating evidence") (footnote omitted). In other words, this Court has held that an officer's "mixed motives" invalidate an objectively valid inventory search. Indeed, Appellant has based his entire argument on appeal from these cases and this precedent. **See** Appellant's Brief at 22-37; Appellant's Reply Brief at 3-13.

I also note that the above precedent was based upon statements from the United States Supreme Court, wherein the High Court suggested that the mixed motivations of individual officers might invalidate "a search conducted

in the absence of probable cause" – such as searches conducted pursuant to the community caretaking doctrine. *Whren*, 517 U.S. at 811-812 (emphasis omitted); *see also Cady v. Dombrowski*, 413 U.S. 433, 441 (1973) (noting that police officers "engage in . . . community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute"); *South Dakota v. Opperman*, 428 U.S. 364, 375-376 (1976) (upholding vehicle impoundment and inventory search because the police followed a standard procedure and "there [wa]s no suggestion whatever that this standard procedure, essentially like that followed throughout the country, was a pretext concealing an investigatory police motive"); *New York v. Berger*, 482 U.S. 691, 716 n.27 (1987) (in upholding a "warrantless search of an automobile junkyard, conducted pursuant to" the administrative inspection exception, the Court declared: "[t]here is . . . no reason to believe that the instant inspection was actually a 'pretext' for obtaining evidence of respondent's violation of the penal laws"); *Whren*, 517 U.S. at 811-812 (declaring that the Court's statements in *Bertine* and *Burger* "simply explain that the exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative regulation, is not accorded to searches that are not made for those purposes").

Nevertheless, as the United States Supreme Court has explained, "Fourth Amendment reasonableness is **predominantly** an objective inquiry."

*Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (quotations and citations omitted) (emphasis added). Thus, generally,

> [the United States Supreme Court] ask[s] whether the circumstances, viewed objectively, justify the challenged action. If so, that action was reasonable whatever the subjective intent motivating the relevant officials. This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts and it promotes evenhanded, uniform enforcement of the law.

*Id.* at 736-737 (quotations, citations, and corrections omitted).

This pure objective-based approach gives way in "limited contexts such as an inventory search or administrative inspection" – where an officer's subjective motivation may "invalidate[] objectively justifiable behavior under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452 (2011) (citations and quotations omitted). The question in our case is: when and at what level does an officer's subjective motivation invalidate that officer's "objectively justifiable behavior"? I believe that the Pennsylvania Supreme Court's recent opinion in *Livingstone* sheds light on the answer to this question. In *Livingstone*, the Supreme Court held, in the context of the community caretaking doctrine's "public servant exception": "**in a community caretaker context, when under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns** . . . [and that,] so long as a police officer is able to point to specific, objective, and articulable facts which, standing alone,

- 20 -

reasonably would suggest that his assistance is necessary, **a coinciding subjective law enforcement concern by the officer will not negate the validity of that search under the public servant exception to the community caretaking doctrine**." *Livingstone*, 174 A.3d at 636-637 (emphasis added) (citations and quotations omitted).

In *Livingstone*, Pennsylvania State Trooper Jeremy Frantz was on duty and driving his marked police cruiser when he saw a vehicle stopped on the shoulder of Interstate 79; the vehicle's "engine was running, but the hazard lights were not activated." *Id.* at 614. Trooper Frantz "activated his emergency lights and, with his passenger window down, pulled alongside the stopped vehicle." *Id.* The trooper looked into the vehicle's window and saw Victoria Livingstone sitting in the driver's seat with "glossy eyes" and a "hundred mile stare." *Id.* After speaking to Ms. Livingstone and observing other signs of intoxication, Trooper Frantz arrested Ms. Livingstone. A subsequent blood test revealed that Ms. Livingstone had a blood alcohol content ("BAC") in excess of the legal limit. *Id.*

Ms. Livingstone filed a motion to suppress the results of her BAC test, claiming that it was the fruit of an unconstitutional seizure. The trial court denied the motion because "Trooper Frantz, after observing [Ms. Livingstone's] vehicle on the side of the interstate, had a duty to determine whether [she] was in need of assistance, and his act of approaching [her] vehicle with his overhead emergency lights was a mere encounter." *Id.* at 615 (quotations omitted).

After Ms. Livingstone was convicted of DUI, she appealed to this Court and we affirmed her judgment of sentence. The Pennsylvania Supreme Court granted Ms. Livingstone's petition for allowance of appeal and reversed our order. *Id.* at 638.

Initially, the **Livingstone** Court held that, "when Trooper Frantz pulled alongside [Ms. Livingstone's] vehicle, with his emergency lights activated, [Ms. Livingstone] was subjected to an investigative detention." *Id.* at 619. Since this initial seizure was not supported by reasonable suspicion or probable cause, the Supreme Court next had to determine whether the seizure was valid under the public servant exception to the warrant requirement. *Id.* at 619-620.

The Court began its analysis by noting that the "community caretaking doctrine" encompasses three exceptions to the warrant requirement: "the emergency aid exception; the automobile impoundment/inventory exception; and the public servant exception." *Id.* at 626-627. The Court declared that each of the three exceptions "contemplates that the police officer's actions will be motivated by a desire to render aid or assistance, rather than the investigation of criminal activity." *Id.* at 627. After conducting a 50-state survey of the public servant exception, the Court held that, in Pennsylvania, the applicability of the public servant exception depends upon three essential factors:

> [1]] the officer must point to specific, objective, and articulable facts which would reasonably suggest to an experienced officer that assistance was needed; [2)] the

- 22 -

police action must be independent from the detection, investigation, and acquisition of criminal evidence; and, [3)] based on a consideration of the surrounding circumstances, the action taken by police must be tailored to rendering assistance or mitigating the peril.

*Id.* at 637.

With respect to the second factor – that "the police action must be independent from the detection, investigation, and acquisition of criminal evidence" – the Supreme Court noted that the factor "is a common requirement to warrantless searches under all three exceptions of the community caretaking doctrine, including the emergency aid exception and the automobile impoundment/inventory exceptions." *Id.* at 635. The *Livingstone* Court then explained, in depth, what it meant in requiring that "the police action must be independent from the detection, investigation, and acquisition of criminal evidence." *See id.* I quote the *Livingstone* Court's explanation at length:

> To describe th[e] requirement [that "the police caretaking action must be independent from the detection, investigation, and acquisition of criminal evidence"], courts have utilized various terminology. . . . Regardless of the language used, a critical component of the community caretaking doctrine **is that the police officer's action be based on specific and articulable facts which, viewed objectively and independent of any law enforcement concerns, would suggest to a reasonable officer that assistance is needed**.
>
> We are not suggesting, however, that an officer's contemporaneous subjective concerns regarding criminal activity will preclude a finding that a seizure is valid under the community caretaking function. The Wisconsin Supreme Court addressed a similar argument in [*State v. Kramer*, 759 N.W.2d 598 (Wis. 2009)], wherein the motorist argued

- 23 -

that the "totally divorced" language from **Cady** "means that the officer must have ruled out any possibility of criminal activity before the community caretaker function is *bona fide*." 759 N.W.2d at 606. In rejecting the motorist's suggestion, the court reasoned:

[T]he nature of a police officer's work is multifaceted. An officer is charged with enforcing the law, but he or she also serves as a necessary community caretaker when the officer discovers a member of the public who is in need of assistance. As an officer goes about his or her duties, an officer cannot always ascertain which hat the officer will wear – his law enforcement hat or her community caretaker hat. For example, an officer may come upon what appears to be a stalled vehicle and decide to investigate to determine if assistance is needed; however, the investigation may show that a crime is being committed within the vehicle. Therefore, from the point of view of the officer, he or she must be prepared for either eventuality as the vehicle is approached. Accordingly, the officer may have law enforcement concerns, even when the officer has an objectively reasonable basis for performing a community caretaker function.

To conclude otherwise would ignore the multifaceted nature of police work and force police officers to let down their guard and unnecessarily expose themselves to dangerous conditions.

Furthermore, to interpret the "totally divorced" language in **Cady** to mean that an officer could not engage in a community caretaker function if he or she had any law enforcement concerns would, for practical purposes, preclude police officers from engaging in any community caretaker functions at all. This result is neither sensible nor desirable.

759 N.W.2d at 608-609 (citations omitted). The court concluded that, "**in a community caretaker context, when under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement**

**concerns**." *Id.* at 608; *see also* [*State v. Smathers*, 753 S.E.2d 380, 386 (N.C. App. 2014)] (adopting an "objective method of inquiry into the purpose of a seizure in the community caretaking context," and declining to adopt a test where subjective concerns of crime prevention and investigation negate public safety concerns); *cf Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006) ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively justify [the] action.' The officer's subjective motivation is irrelevant." (emphasis original, citations omitted)).

We agree that it is not realistic or wise to expect an officer to ignore the nature of his or her role in law enforcement – or its inherent dangers – in order for the public servant exception of the community caretaking doctrine to apply. **Thus, so long as a police officer is able to point to specific, objective, and articulable facts which, standing alone, reasonably would suggest that his assistance is necessary, a coinciding subjective law enforcement concern by the officer will not negate the validity of that search under the public servant exception to the community caretaking doctrine**. We caution, however, that "when the community caretaking exception is involved to validate a search or seizure, courts must meticulously consider the facts and carefully apply the exception in a manner that mitigates the risk of abuse." [*State v. McCormick*, 494 S.W.3d 673, 688 (Tenn. 2016)].

*Livingstone*, 174 A.3d at 635-637 (emphasis added).[8]

The *Livingstone* Court held that "Trooper Frantz's seizure of [Ms. Livingstone] was not justified under the public servant exception." *See id.* at 638. A plurality of the Court reasoned that, even though it did not "doubt

---

[8] The block quotation is taken from Part II(B) of the *Livingstone* opinion. We note that a majority of the *Livingstone* Court joined this section of the opinion. *See Livingstone*, 174 A.3d at 638 (Justice Todd authored *Livingstone*; Chief Justice Saylor and Justice Dougherty joined the opinion in full; Justice Baer joined Parts I, II(A), and II(B) of the opinion).

Trooper Frantz's statement that he pulled alongside [Ms. Livingstone's] vehicle simply to check to see whether she needed assistance," it was required to reverse because the trooper "was unable to articulate any specific and objective facts that would reasonably suggest that [Ms. Livingstone] needed assistance."[9] *Id.*

I see no reason why *Livingstone's* holding would not also apply to the inventory exception. Indeed, the *Livingstone* Court explained that the second factor of its test – that "the police action must be independent from the detection, investigation, and acquisition of criminal evidence" – "is a common requirement to warrantless searches under all three exceptions of the community caretaking doctrine, including the emergency aid exception and the automobile impoundment/inventory exceptions." *Id.* at 635. The Court then defined the "independent from" language as meaning, in the context of the community caretaking doctrine, that: "when under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns." *Id.* at 636, *quoting Kramer*, 759 N.W.2d at 608.

_____

[9] The *Livingstone* Court's "application of the public servant exception under the community caretaking doctrine" to the case before it was contained in Part II(C) of the opinion. This portion of the opinion did not garner a majority of the justices. *See Livingstone*, 174 A.3d at 638.

At the very least, **Livingstone** refines the prior precedent from this Court, where we held or suggested that an officer's "mixed motives" invalidate an objectively valid inventory search. **See supra** at **18-19. Further, **Livingstone** highlights that – while the subjective motivation of individual officers is a relevant consideration in the context of inventory searches – an objectively valid inventory search is constitutional so long as it was done "**in good faith and not for the sole purpose of investigation**." **Lagenella**, 83 A.3d at 102-103 (quotations and citations omitted) (emphasis added); **see also Bertine**, 479 U.S. at 372 (holding that a vehicle inventory search was valid and declaring that "there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation").

I will now analyze Appellant's claim that "the trial court erred in denying [his] suppression motion because [the] police conducted the search for criminal investigatory, rather than non-criminal inventory, purposes." Appellant's Brief at 5. As noted:

> In determining whether a proper inventory search has occurred, the first inquiry is whether the police have lawfully impounded the automobile, *i.e.*, have lawful custody of the automobile. . . .
>
> The second inquiry is whether the police have conducted a reasonable inventory search. An inventory search is reasonable if it is conducted pursuant to reasonable standard police procedures and in good faith and not for the sole purpose of investigation.

**Lagenella**, 83 A.3d at 102-103 (quotations and citations omitted).

Here, the initial traffic stop of Appellant's vehicle was proper, as the police had probable cause to believe that Appellant was driving a vehicle while his operating privilege was suspended, in violation of 75 Pa.C.S.A. § 1543(b)(1). **Whren**, 517 U.S. at 813 (holding: "the constitutional reasonableness of traffic stops [does not] depend[] on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis").[10]

Further, although Appellant does not specifically challenge the lawfulness of the impoundment, I note: Appellant was not legally permitted to operate his vehicle; Appellant stopped his vehicle "in the lane of travel" on the on-ramp to a heavily-traveled interstate highway; Appellant's vehicle posed a safety hazard to other motorists; there was no other person in

_____

[10] Appellant does not specifically challenge the validity of the initial traffic stop. Nevertheless, Appellant claims that the circumstances surrounding the traffic stop "underscore[] the investigatory motive of the [inventory] search." Appellant's Brief at 23. For example, Appellant claims: "[p]olice repeatedly conducted surveillance at [Appellant's] apartment;" "[a]lthough aware that [Appellant] was driving without a license, the police . . . gave up repeated chances to pull him over to address the traffic infraction;" and, the police "stopped [Appellant] only after they suspected that he was carrying drugs and when his car could only be parked in a position that would allow them to argue that it posed a public-safety risk." **See** Appellant's Brief at 23-24. To the extent Appellant attempts to probe the subjective motivations of Officer Sullivan and Detective Moss for making the initial traffic stop, the attempt fails. **Whren**, 517 U.S. at 813 (holding: "the constitutional reasonableness of traffic stops [does not] depend[] on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis").

Appellant's vehicle; and, Appellant did not know anyone "close" who could move the vehicle.[11]  The suppression court also determined that, under these

_____

[11] Again, Appellant does not specifically challenge the lawfulness of the impoundment.  Appellant's Brief at 5 and 22-37.  However, in claiming that the inventory search was merely a pretext for an investigatory search, Appellant also attempts to demonstrate that Detective Moss's actions, which led to the impoundment, "further show the criminal investigatory, rather than caretaking, **motive of the search**."  Appellant's Brief at 28 (emphasis added).  As to this argument, Appellant claims that Detective Moss did not follow the Ross Township Vehicle Tow Policy because Detective Moss:  failed to inform Appellant "that if he could arrange for a valid driver to move the car within 20 minutes, [the] police would not tow it" and did not permit Appellant to "move his car a couple [of] feet so that it was completely on the berm" and would not pose a safety hazard.  *Id.* at 28-30.  Further, Appellant claims that the police should have pulled him over earlier, but manipulated the traffic stop so that he would park his car "in a position that would allow them to argue that it posed a public-safety risk."  *Id.* at 24.

With respect to the first claim (that Detective Moss failed to inform Appellant "that if he could arrange for a valid driver to move the car within 20 minutes, [the] police would not tow it"), the evidence reveals that Detective Moss substantially complied with the Ross Township Vehicle Tow Policy.  Detective Moss testified that he provided Appellant with the opportunity to arrange for another driver to come to move the car, but Appellant informed him that there was no one "close" who could accomplish the action and the vehicle, as it stood, posed a safety hazard to other motorists.  Moreover, the trial court specifically found:  "[c]onsistent with departmental policy, [Appellant] was provided with an opportunity to have a local associate retrieve his vehicle[; however, when Appellant] advised the officers that nobody was available to retrieve the vehicle, [Detective] Moss sought to have the vehicle towed as it was occupying the side of the road on the entry lane to a busy interstate highway."  Trial Court Opinion, 6/22/17, at 5.

As to the second claim (that Detective Moss did not permit Appellant to "move his car a couple [of] feet so that it was completely on the berm" and would not pose a safety hazard), Appellant was not legally permitted drive or to park his vehicle on the berm of Interstate 279.  *See* 75 Pa.C.S.A. § 3353(a)(2)(vii).

facts, the police were required to impound Appellant's vehicle because "nobody [was] within close proximity to the scene [who] could retrieve the vehicle and [] the vehicle was posing a safety hazard to passing motorists." Trial Court Opinion, 6/22/17, at 3.

Thus, on appeal, it is unquestioned that, when the police began the inventory search, the police had "lawfully impounded the automobile, *i.e.*, ha[d] lawful custody of the automobile." *Lagenella*, 83 A.3d at 102-103 (quotations and citations omitted).

As to the inventory search itself, Detective Moss testified that, pursuant to Ross Township Police policy, he is required to inventory a vehicle prior to the tow and that he would normally do so by, first, either memorizing the contents of the vehicle or "writ[ing the contents] in [his] notebook" prior to the tow. N.T. Suppression Hearing, 1/21/16, at 54 and 89-90. He testified that his policy is to then complete a standard inventory form "when [he] get[s] back to the station." *Id.* at 89. Further, under the Ross Township Vehicle Tow Policy, Detective Moss is granted 24 hours to submit his completed Inventory Report form to the Records Division. Ross Township Vehicle Tow Policy § 904(C)(4).

---

Finally, with respect to the final claim (that the police should have pulled him over earlier, but manipulated the traffic stop so that he would park his car "in a position that would allow them to argue that it posed a public-safety risk"), I again note that "the constitutional reasonableness of traffic stops [does not] depend[] on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813.

Detective Moss testified that he began the inventory search of Appellant's vehicle after he confirmed that he would need to tow the vehicle. N.T. Suppression Hearing, 1/21/16, at 87. As Detective Moss testified, he initiated the inventory search by looking into the black drawstring bag that was sitting on Appellant's passenger seat. *Id.* Detective Moss testified that, after he saw contraband in the bag, he "stopped the inventory . . . [so that he could] obtain a search warrant and search the rest of the vehicle for further narcotics" and arrested Appellant. *Id.* at 56. The suppression court heard this testimony and concluded that Detective Moss performed a valid inventory search. Trial Court Opinion, 6/22/17, at 5.

On appeal, Appellant attempts to delve into Detective Moss's subjective motivations for performing the inventory search. Specifically, Appellant impugns the search by terming it "pretextual." *See* Appellant's Brief at 31. The majority agrees with Appellant and holds that reversal is mandated because, in conducting the inventory search, "[t]he police did not adhere to standard polices; the search was not conducted in good faith; and the purpose of the search was to discover evidence for a criminal drug investigation." Majority Opinion at *9. In reaching these holdings, I respectfully believe that the majority has disregarded our standard of review. Rather than viewing the evidence in the light most favorable to the Commonwealth, the majority's factual recitation and analysis is replete with it second-guessing the decisions of the police, viewing all police actions in a sinister light, and making new and unwarranted credibility determinations. Further, not only does the majority

improperly view the evidence in the light most favorable to Appellant, but the majority also incorrectly holds that an officer's mixed motives invalidate an otherwise permissible inventory search and the majority illogically affords Appellant greater individual protection – in effect, shielding Appellant – from an otherwise permissible vehicle stop and inventory search simply because the officers **also** suspected Appellant of possessing contraband.

I believe that, when the circumstances are viewed properly, it is clear that the police were required (by policy) to tow Appellant's vehicle and that Detective Moss was required (by policy) to perform an inventory of the vehicle before the tow. Detective Moss acted in accordance with this policy and began his inventory by looking into the black drawstring bag. Further, since he discovered contraband in this item, Detective Moss "stopped the inventory . . . [so that he could] obtain a search warrant and search the rest of the vehicle for further narcotics" and arrested Appellant. N.T. Suppression Hearing, 1/21/16, at 56.

Under these facts, I would conclude that Detective Moss conducted the inventory search "pursuant to reasonable standard police procedures."[12]

---

[12] Appellant argues that Detective Moss violated standard police procedures because he completed a standard "Inventory Report Form," but "omitted numerous items" from the form, "such as a spare tire, jack, lug wrench and insurance card." Appellant's Brief at 32. Appellant fails to recognize that Detective Moss's inventory search began and ended with the black drawstring bag – the remainder of the vehicle was searched pursuant to the search warrant. Further, although Detective Moss filled out the Inventory Report Form, he testified that he completed the form pursuant to the search warrant,

*Lagenella*, 83 A.3d at 102-103 (quotations and citations omitted). Moreover, even though Detective Moss might have possessed "mixed motives" for conducting the inventory search, the inventory was not conducted "**for the sole purpose of investigation**" and Detective Moss's action, in performing the inventory search, was, "under the totality of the circumstances . . . objectively reasonable."[13] **See id.** (quotations and citations omitted)

_____

not the inventory search. N.T. Suppression Hearing, 1/21/16, at 60 and 89-96 (Detective Moss testified that Appellant's vehicle "wasn't inventoried. It was searched pursuant to the search warrant" and that he "completed the inventory form, but [he] didn't complete the inventory"). Finally, this Court's past precedent declared that Detective Moss was required to stop the inventory and obtain a search warrant after he discovered the contraband. **See Commonwealth v. Casanova**, 748 A.2d 207, 212 (Pa. Super. 2000) (holding that, after the police discovered contraband in the vehicle, "they should have obtained a search warrant"); **but see Gary**, 91 A.3d at 138 ("in this Commonwealth, the law governing warrantless searches of motor vehicles is coextensive with federal law under the Fourth Amendment. The prerequisite for a warrantless search of a motor vehicle is probable cause to search; no exigency beyond the inherent mobility of a motor vehicle is required").

[13] Almost the entirety of Appellant's argument is devoted to claiming that Detective Moss's "mixed motives" caused the inventory search to be unconstitutional. **See** Appellant's Brief at 22-37; **see also** Appellant's Reply Brief at 8 (arguing that we must reverse because the trial court found that Detective Moss had "at least a partial investigatory motive"). As noted above, I believe that this claim fails in light of **Lagenella** and **Livingstone**. Further, to the extent Appellant claims that Detective Moss "admitted that his intention in searching [Appellant's] car was to find drugs," I believe this claim fails because Detective Moss repeatedly testified that, although he "hope[d] to find [Appellant] in possession of drugs," **the "real reason for executing this traffic stop . . . [was that Appellant was] DUI suspended**." N.T. Suppression Hearing, 1/21/16, at 69 and 72 (emphasis added). Again, and contrary to Appellant's claim on appeal and the majority's holding today, Detective Moss's mixed motives do not render the inventory search unconstitutional.

(emphasis added); *Livingstone*, 174 A.3d at 636. In other words, the inventory search was valid because, regardless of Detective Moss's mixed motives, Detective Moss possessed specific and objective grounds to support the impoundment and inventory search of Appellant's vehicle, Detective Moss followed standard police procedures in conducting the impoundment and inventory search, and the inventory search was done "**in good faith and not for the sole purpose of investigation**." I would thus conclude that Appellant's first claim on appeal fails.[14], [15]

---

[14] Again, I do not suggest that the subjective motivation of individual officers is irrelevant in the context of inventory searches. Indeed, as I have stressed, it is a relevant consideration. However, as the Pennsylvania Supreme Court has explained, "[a]n inventory search is reasonable if it is conducted pursuant to reasonable standard police procedures and **in good faith and not for the sole purpose of investigation**." *Lagenella*, 83 A.3d at 102-103 (quotations and citations omitted) (emphasis added); *see also Livingstone*, 174 A.3d at 637 ("so long as a police officer is able to point to specific, objective, and articulable facts which, standing alone, reasonably would suggest that his assistance is necessary, a coinciding subjective law enforcement concern by the officer will not negate the validity of that search under the public servant exception to the community caretaking doctrine"); *see also Bertine*, 479 U.S. at 372 (holding that a vehicle inventory search was valid and declaring that "there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation"). Obviously, the "in good faith and not for the sole purpose of investigation" bar is set very high. However, the United States Supreme Court and the Pennsylvania Supreme Court set this bar – and we must adhere.

[15] In arriving at its conclusion that an officer's "mixed motives" will invalidate an otherwise objectively valid inventory search, the majority examines *Commonwealth v. Collazo*, 654 A.2d 1174 (Pa. Super. 1995) and *In Interest of M.W.*, 194 A.3d 1094 (Pa. Super. 2018). In both *Collazo* and *M.W.*, this Court held that the police conducted valid inventory searches and,

- 34 -

For Appellant's second claim, Appellant challenges the discretionary aspects of his sentence. "[S]entencing is a matter vested in the sound discretion of the sentencing judge, whose judgment will not be disturbed absent an abuse of discretion." ***Commonwealth v. Ritchey***, 779 A.2d 1183, 1185 (Pa. Super. 2001). Moreover, pursuant to statute, Appellant does not have an automatic right to appeal the discretionary aspects of his sentence.

---

in holding that the searches were valid, we declared: the officer's "motive for [conducting the inventory search] was solely to identify the owner of the vehicle and not to uncover evidence of a crime. As a result, the officers lawfully conducted a proper inventory search." ***In Interest of M.W.***, 194 A.3d at 1101; ***see also Collazo***, 654 A.2d at 1177 ("[t]he motive for the [inventory search] was solely to identify its owner and not to uncover evidence of crime. The search, therefore, was within the caretaking function of the police, and, as such, was properly conducted without a warrant"). The majority then uses these statements to support its proposition that an officer's "mixed motives" will invalidate an objectively reasonable inventory search.

I believe that the majority reads too much into ***Collazo*** and ***M.W.*** First, the cases are of limited use because, in both cases, we held that the officers conducted valid inventory searches. Second, in rendering our holdings, we merely stated the obvious: that, where "the motive for [conducting the inventory search] was solely to identify the owner of the vehicle and not to uncover evidence of a crime," the inventory search is valid. ***In Interest of M.W.***, 194 A.3d at 1101. In contrast to what the learned majority apparently believes, our statements in ***Collazo*** and ***M.W.*** do not mean that, for an inventory search to be valid, an officer **must** have a "pure" motivation to conduct the inventory search. The statements simply declare that, in those cases, each officer held a pure, subjective motivation to conduct the inventory search and, as a result, the searches were unquestionably valid. Finally, the statements in ***Collazo*** and ***M.W.*** are from this Court – not the United States Supreme Court or the Pennsylvania Supreme Court. The statements thus cannot purport to overrule the Pennsylvania Supreme Court's holding that "[a]n inventory search is reasonable if it is conducted pursuant to reasonable standard police procedures and in good faith **and not for the sole purpose of investigation**." ***Lagenella***, 83 A.3d at 102-103 (quotations and citations omitted) (emphasis added).

*See* 42 Pa.C.S.A. § 9781(b). Instead, Appellant must petition this Court for permission to appeal the discretionary aspects of his sentence. *Id.*

As this Court explained:

> [t]o reach the merits of a discretionary sentencing issue, we conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, Pa.R.A.P. 902, 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, [42 Pa.C.S.A.] § 9781(b).

*Commonwealth v. Cook*, 941 A.2d 7, 11 (Pa. Super. 2007).

In the case at bar, Appellant filed a timely post-sentence motion and notice of appeal. Further, within Appellant's Rule 2119(f) statement, Appellant contends (amongst other things) that the trial court sentenced him excessively because it incorrectly believed "that [Appellant] was only off [of federal] supervision for one month before the instant arrest." Appellant's Brief at 42; *see also* Trial Court Opinion, 6/22/17, at 9. As Appellant declares, "[t]hat information was incorrect, as [Appellant] was off supervision for more than one year" prior to his arrest.[16] *Id.*

---

[16] Appellant did not raise this claim in his post-sentence motion or concise statement of errors complained of on appeal. Appellant's Post-Sentence Motion, 7/29/16, at 1-4; Appellant's Rule 1925(b) Statement, 4/17/17, at 1-5. However, as Appellant correctly notes, "[a]t the sentencing hearing, the trial court did not cite as justification for the sentence its belief that [Appellant] ha[d] only been off of supervision for one month" and "[t]he first time the trial court mentioned this factor was in its written opinion," which the trial court

This claim raises a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. Indeed, as this Court has held:

> prior to imposing sentence a sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.
>
> Nevertheless, the discretion of a sentencing judge is not unfettered; **a defendant has the right to minimal safeguards to ensure that the sentencing court does not rely on factually erroneous information, and any sentence predicated on such false assumptions is [inimical] to the concept of due process**.

***Commonwealth v. Rhodes***, 990 A.2d 732, 746 (Pa. Super. 2009) (quotations and citations omitted) (emphasis added).

In its Rule 1925(a) opinion, the trial court justified its sentence by declaring: "it was only approximately one month after he was release[d] from federal supervision on that case that he was arrested in this case." Trial Court Opinion, 6/22/17, at 9. Appellant claims that this assertion is factually incorrect, as he "was off supervision for more than one year" prior to his arrest. Appellant's Brief at 42. The Commonwealth agrees with Appellant and notes that the trial court's statement was "mistaken[]." Commonwealth's Brief at 44 n.13. Further, the trial court utilized this factually incorrect

---

filed well after Appellant filed his post-sentence motion and Rule 1925(b) statement. **See** Appellant's Brief at 52 n.9; **see also** Trial Court Opinion, 6/22/17, at 1-10. Therefore, since the first time Appellant could have raised the current claim was in his appellate brief, I would conclude that Appellant's claim on appeal is not waived.

statement to substantiate its conclusion that: "the record reflects [Appellant's] absolute unwillingness to conform his conduct to the dictates of the law." Trial Court Opinion, 6/22/17, at 9.

Given the trial court's mistake, I would vacate Appellant's judgment of sentence and remand for resentencing, as it appears that "the sentencing court . . . rel[ied] on factually erroneous information" when it sentenced Appellant.[17] **Rhodes**, 990 A.2d 746 (quotations and citations omitted); **see also Commonwealth v. Bethea**, 379 A.2d 102, 106-107 (Pa. 1977) ("[i]n deciding whether a trial judge considered only permissible factors in sentencing a defendant, an appellate court must, of necessity, review all of the judge's comments. **Moreover, in making this determination it is not necessary that an appellate court be convinced that the trial judge in fact relied upon an erroneous consideration; it is sufficient to render a sentence invalid if it reasonably appears from the record that the trial court relied in whole or in part upon such a factor**") (emphasis added). In all other respects, however, I would affirm.

Thus, I dissent.

---

[17] Since I would vacate Appellant's judgment of sentence and remand for resentencing, Appellant's remaining discretionary aspects of sentencing claims are moot.